IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MICHELLE HOUCKS; | ) | |
| SAUNDRA NEWSOM; | ) | |
| NIKO QUINN; | ) | |
| OPHELIA WILLIAMS; AND | ) | |
| RICHELLE MILLER, | ) | |
| | ) | |
|     PLAINTIFFS, | ) | |
| | ) | |
| V. | ) | CASE NO.: |
| | ) | |
| UNIFIED GOVERNMENT OF | ) | |
| WYANDOTTE COUNTY AND KANSAS | ) | |
| CITY, KANSAS; | ) | |
| | ) | |
| *POLICE CHIEF Defendants:* | ) | |
| THOMAS DAILEY; JAMES SWAFFORD; | ) | |
| RONALD MILLER; | ) | |
| | ) | |
| *DETECTIVE Defendants:* | ) | |
| ROGER GOLUBSKI; TERRY ZEIGLER; | ) | |
| MICHAEL KILL; CLAYTON BYE; | ) | |
| DENNIS WARE, ALL IN THEIR | ) | |
| INDIVIDUAL CAPACITIES, | ) | |
| | ) | |
|     DEFENDANTS. | ) | |

## COMPLAINT AND JURY DEMAND

The Plaintiffs Michelle Houcks, Saundra Newsom, Niko Quinn, Ophelia Williams, and

Richelle Miller, by and through their attorneys, allege:

# TABLE OF CONTENTS

Table of Contents ........................................................................................................................ i

Introduction ............................................................................................................................. 1

Jurisdiction and Venue ........................................................................................................... 5

Parties ..................................................................................................................................... 5

    Plaintiffs ............................................................................................................................ 5

    Unified Government Defendant ......................................................................................... 6

    Police Chief Defendants ................................................................................................... 6

    Detective Defendants ....................................................................................................... 8

Facts ...................................................................................................................................... 10

    For decades, Defendants operated a government-sanctioned protection racket .............. 10

    With the Unified Government's full knowledge, this criminal enterprise spent decades terrorizing the Black community, preying upon and coercing sexual acts from vulnerable Black women ...................................................................................................................... 13

    Golubski used his authority as a police officer to rape Michelle Houcks ........................ 16

    Defendants and their Protection Racket conspired to murder Saundra Newsom's son, then used the hope of an investigation as leverage to sexually harass Newsom ...................... 20

    In furtherance of Defendants' scheme to cover up the Quinn-Ewing murders, Golubski and Ware exploited Niko Quinn and forced her to give false testimony; years later Golubski sexually assaulted Quinn .................................................................................... 28

    Golubski falsely accused Ophelia Williams' twin sons of murder to protect organized criminals and to gain access to her so he could rape and sexually assault her ................ 39

    Kill and Bye used their authority as police officers to abuse and sexually assault Richelle Miller ................................................................................................................................ 45

    The Unified Government Caused Plaintiffs' Injuries ...................................................... 47

        Informal policies, procedures, and customs created a widespread practice of police abusing government authority ............................................................. 49

            Kidnapping, coercing, pressuring, sexually assaulting, and raping Black women ........................................................................................................... 49

            Improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket ............................ 51

Discouraging, preventing, and failing to investigate complaints of misconduct ................................................................................................ 57

Failure to adequately train and supervise its employees permitted the conduct ................................................................................................................ 60

KCKPD officers openly admit the existence of the Unified Government's policies and procedures ......................................................................................... 62

Decisions by Chiefs of Police encouraged further abuse, including ratifying unconstitutional conduct and fostering a culture of abuse ..................... 67

Damages ......................................................................................................................... 68

Defendants Interfered with Quinn's, Newsom's, and Williams' Care, Custody, and Control of their Children, A Fundamental Liberty Interest Protected by the United States Constitution and the Kansas Constitution ............................................................................................ 69

Defendants' Conduct has Tolled any Applicable Statutes of Limitation .................................... 71

The Civil Rights Act of 1871 Bars any Statute of Limitations ..................................................... 79

Claims for Relief ............................................................................................................................ 81

Counts of Michelle Houcks ............................................................................................ 81

COUNT 1 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983 .............................................................................. 81

COUNT 2 Failure to Intervene in Violation of 42 U.S.C. § 1983 ....................... 83

COUNT 3 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ................. 85

COUNT 4 Supervisory Liability in Violation of 42 U.S.C. § 1983 ..................... 86

COUNT 5 Monell Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983 ........................................................ 87

Counts of Niko Quinn ..................................................................................................... 90

COUNT 6 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983 .............................................................................. 90

COUNT 7 Interference with Family Relationships in Violation of 42 U.S.C. § 1983 ........................................................................................................ 92

COUNT 8 Failure to Intervene in Violation of 42 U.S.C. § 1983 ....................... 94

COUNT 9 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ................. 96

COUNT 10 Supervisory Liability in Violation of 42 U.S.C. § 1983 ................... 97

COUNT 11 Monell Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983 ........................................................ 99

Counts of Saundra Newsom ........................................................................................... 101

COUNT 12 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983 ........................................................................ 101

COUNT 13 Interference with Family Relationships in Violation of 42 U.S.C. § 1983 ..................................................................................................... 104

COUNT 14 Failure to Intervene in Violation of 42 U.S.C. § 1983 .................... 105

COUNT 15 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ............. 107

COUNT 16 Supervisory Liability in Violation of 42 U.S.C. § 1983 ................. 108

COUNT 17 *Monell* Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983 ....................................................... 110

Counts of Ophelia Williams ............................................................................... 112

COUNT 18 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983 ........................................................................ 112

COUNT 19 Interference with Family Relationships in Violation of 42 U.S.C. § 1983 ..................................................................................................... 115

COUNT 20 Failure to Intervene in Violation of 42 U.S.C. § 1983 .................... 117

COUNT 21 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ............. 119

COUNT 22 Supervisory Liability in Violation of 42 U.S.C. § 1983 ................. 120

COUNT 23 *Monell* Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983 ....................................................... 122

Counts of Richelle Miller .................................................................................... 124

COUNT 24 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983 ........................................................................ 124

COUNT 25 Failure to Intervene in Violation of 42 U.S.C. § 1983 .................... 126

COUNT 26 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ............. 127

COUNT 27 Supervisory Liability in Violation of 42 U.S.C. § 1983 ................. 128

COUNT 28 *Monell* Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983 ....................................................... 130

Demand for Jury Trial ......................................................................................... 132

Designation of Place of Trial .............................................................................. 133

Prayer for Relief .................................................................................................. 133

## INTRODUCTION

1.      Jim Crow was designed to ensure emancipation was an illusion and white supremacy remained the *de facto* law of the land. It stripped Black citizens of their civil rights, made it easier to arrest them, and guaranteed it was harder for them to win their freedom in courts. Jim Crow ensured a Black woman's body was no more entitled to police protection than a Black man's neck. But Jim Crow was not restricted to the rebellious confederate states. It also poisoned the Free State, despite its Capitol's mural of John Brown raging against the injustice of white supremacy.

2.      This case evidences the Free State's infection. For decades, the Unified Government gave its law enforcement, personified by Detective Roger Golubski, permission to terrorize, abuse, and violate its Black citizens. With government authority, a plague of State agents used their badges as licenses to stalk, assault, beat, rape, harass, frame, and threaten Black citizens in protected police hunting grounds. These unconstitutional horrors were inflicted under threats and terror designed to deny these citizens any remedy. The Unified Government continues to sow the abuses of Jim Crow into the present day. Over decades, Defendants have threatened, coerced, and manipulated society's most vulnerable for their own sadistic pleasures. Their conduct is reprehensible, inexcusable, and malicious.

3.      But this case is not just about Golubski and his widely known sexual predations and assaults of Black women. The monumental issue concerns the responsibility public officials must bear for enabling and fostering a well-known, decades-long terrorization of the Black community. These public officials, including Chiefs of Police, though warned, informed, and aware of these unconstitutional and criminal acts, permitted a terror that lasted decades, destroying lives and families.

1

4.      The victims in this case represent a cross-section or sampling of the wrongs inflicted upon hundreds of unnamed victims, living and dead. Michelle Houcks and Ophelia Williams are victims of particularly vicious rapes. Saundra Newsom was stalked and propositioned under the guise of investigating her son's murder. To protect the criminals who murdered Newsom's son in broad daylight and in front of witnesses, Defendants forced eyewitness Niko Quinn, also the victim of sexual assault, to perjure herself – falsely identifying an innocent man as the assassin – under threat of wrongful imprisonment and having her children stolen by the State. Richelle Miller was sadistically tortured, senselessly forced to view her father's unidentifiably charred corpse, and then falsely arrested while repeatedly and groundlessly accused of incest and complicity in her father's murder. The brutal 19-hour long tag-team interrogation culminated in sexual assault. These victims were then threatened with violence if they attempted to complain, up to, and including, death. Reprehensible. Inexcusable. Malicious.

5.      The Unified Government permitted this unlawful terrorization by the KCKPD. With the full knowledge of supervisors, including the Chiefs of Police, official government authority was used to gain leverage over and coerce submission from vulnerable Black women. These victims were then forced to obey Defendants' demands, including submitting to sexual assault and fabricating evidence to enable the KCKPD to operate its protection racket and cover for their criminal co-conspirators. Using (actual or threats of) physical violence, arrest, or sexual assaults to them or their loved ones if Plaintiffs talked, Defendants covered their tracks to ensure that their unlawful conduct could continue, unchecked. To solidify their authority, Defendants ensured they publicly harassed and abused women and publicized their successful pinning of false charges on innocent people.

6.     This government-sanctioned power and terrorism forced victims to maintain their silence, to hide from Defendants and conceal their stories. Victims remained fearful that if they spoke out, Defendants would make good on their threats and their bodies would be dumped in the river, just like Golubski warned one of his child-victims, adding his own chilling twist to a nursery rhyme:

> *Down by the river, said a hank-a-pank;*
> *Where they won't find her until she stank.*

7.     These wrongful attempts to conceal their unlawful acts were not solely carried out on the Black community. Some police officers were drawn into the scheme when Defendants provided them with trafficked girls or illegal drugs. When cops did make complaints, they were shunned, ostracized, and found themselves alone and without backup on dangerous calls. Still others kept silent out of fear similarly felt by the Black community. Either way, Defendants' unified message was clear: either join in or keep quiet.

8.     As intended, Defendants' brazen and notorious corruption was exercised for decades with such impunity that the community believed Defendants' claims that they were untouchable. These "dirty cops" flaunted to their victims that they had no fear of repercussions for their conduct. For example, after raping Williams in her home, Golubski methodically wiped bodily fluids off his penis with paper towels from Williams' kitchen. When she mentioned making a complaint about him, he brushed her off: "*Report me to who, the police? I am the police.*" Similarly, while brutally raping Houcks, Golubski calmly told her he was assaulting her "because I can." Defendants' calmness and lack of fear – even while raping women in public – is spine-chilling and evidences the degree to which the Unified Government enabled and endorsed this conduct.

9.      This was repeatedly reinforced to the women Defendants terrorized. Most recently in 2021 and 2022, while *The Kansas City Star* published a series of investigative news stories that revealed KCKPD's corruption, receiving national attention and garnering a Pulitzer Prize, Golubski's victims watched as Defendants, including Golubski, continued to walk free and collect their KCKPD pensions. It was obvious to all: Defendants were immune from all responsibility for their crimes and wrongdoing. They were untouchable. As if to further flaunt their power, Defendants continue falsely representing to the world that the Unified Government's policing was guided by its motto:



The Black community in KCK have long known how fraudulent this representation is. Is protecting violent drug gangs "safety first"? Is raping Black women "courtesy always"?

10.      Finally, on September 15, 2022, Plaintiffs were given their first reason to hope. Early that morning, some Plaintiffs picked up the phone to hear news they feared they would never hear: the FBI arrested Golubski, placing him in handcuffs. After decades of raping and assaulting women, he was finally arrested for depriving the civil liberties of the very women he was sworn to protect. That night, and for the first time in decades, Plaintiffs believed that Golubski might face legal consequences for his consequences and now, *finally*, they might be able to seek the justice that had eluded them for years.

11.      On November 11, 2022, some of the Plaintiffs were again called by the FBI. Another indictment was being filed, charging Golubski in an underaged sex-trafficking conspiracy with one of the drug gangs on whose payroll he operated.

12.     Despite these high-profile arrests, Plaintiffs and Defendants' other victims remain vulnerable to the danger posed by Golubski's longtime colleagues who remain in the KCKPD and continue to operate its protection racket. After years of government-forced silence, some of these Plaintiffs are telling their stories for the very first time. They seek justice, despite receiving threatening messages and, in one case, a home break-in. Nevertheless, because of Golubski's arrest, his multiple federal criminal charges, and the publicity surrounding each, these women finally feel safe *enough* to stand up and expose the corruption, abuse, and racism – the Jim Crow – that has diseased their community for decades.

## JURISDICTION AND VENUE

13.     This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law for Plaintiffs' rights, as secured by the United States Constitution.

14.     This Court has jurisdiction over this action under 28 U.S.C. § 1331.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) because, upon information and belief, all Defendants are residents of Kansas; and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiffs

16.     Plaintiff Michelle Houcks is an individual citizen of the State of Missouri and a 55-year-old resident of Kansas City, Missouri.

17.     Plaintiff Sandra Newsom is an individual citizen of the State of Kansas and a 73-year-old resident of Kansas City, Kansas.

18.     Plaintiff Niko Quinn is an individual citizen of the State of Missouri and a 51-year-old resident of Kansas City, Missouri.

19.     Plaintiff Ophelia Williams is an individual citizen of the State of Kansas and a 60-year-old resident of Kansas City, Kansas.

20.     Plaintiff Richelle Miller is an individual citizen of the State of Kansas and a 40-year-old resident of Topeka, Kansas.

### Unified Government Defendant

21.     Defendant Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"), is the successor of the municipality, the City of Kansas City, Kansas ("KCK"). The Unified Government was created by and established under the law of the State of Kansas in 1997. It is authorized to sue or be sued in its own name. Its headquarters is located at 701 N. 7th Street, Kansas City, Kansas. KCK is a subdivision of the Unified Government and is located within Wyandotte County, Kansas. The Kansas City, Kansas Police Department ("KCKPD") is an agency of the Unified Government.

22.     The edicts or acts of KCKPD's Chief of Police may fairly be said to present the official policy of KCKPD and therefore the Unified Government

23.     As a practical matter and due, at least in part, on KCKPD's hierarchical structure, KCKPD's detectives may also fairly be said to present the official policy of KCKPD and therefore the Unified Government.

### Police Chief Defendants

24.     Defendant Thomas Dailey was, from May 1989 until at least 1994, the duly appointed and active Chief of Police of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Prior to serving as Chief of Police, Dailey was the Captain of KCKPD's vice unit, and was accused of accepting

protection money for illicit prostitution operations in KCK in exchange for advance notice of police raids.[1] At all times relevant to this Complaint, up to and including 1994, Dailey was a supervisor of Golubski, Kill, Bye, Ware, and Zeigler. Upon information and belief, Dailey is entitled to indemnification under statute and by contract. He is sued in both his individual and official capacities.

25.    Defendant James Swafford was, from 1995 until 2000, the duly appointed and active Chief of Police of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. At all times relevant to this Complaint, up to and including 2000, Swafford was a supervisor of Golubski, Kill, Bye, Ware, and Zeigler. Upon information and belief, Swafford is entitled to indemnification under statute and by contract. He is sued in both his individual and official capacities.

26.    Defendant Ronald Miller was, at times relevant to this Complaint, a duly appointed and active police officer of KCKPD, ultimately the Chief of Police, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Miller served as Chief of Police for KCKPD from 2000 to 2006. At all times relevant to this Complaint, up to and including 2006, Miller was a supervisor of Golubski, Kill, Bye, Ware, and Zeigler. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in both his individual and official capacities.

---

[1] *United States v. Russo*, 527 F.2d 1051, 1053-54 (10th Cir. 1975).

27.     Within this Complaint, and during the time frame that each served as KCKPD's Chief of Police, Dailey, Swafford, and Miller are collectively referred to as the "Police Chief Defendants."

**Detective Defendants**

28.     Defendant Roger Golubski was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

29.     Defendant Terry Zeigler was, at times relevant to this Complaint, a duly appointed and active police officer of KCKPD, ultimately the Chief of Police, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Zeigler served as Chief of Police for KCKPD from 2015 to 2019. Before becoming Chief of Police, Zeigler was Golubski's partner. Zeigler announced his retirement from the KCKPD after a former police academy cadet sued KCKPD for firing her when she reported an officer sexually assaulted her.[2] In 2018, Zeigler faced additional public scrutiny for living in a house owned by the Unified Government in Wyandotte County Lake Park for next to nothing.[3] The Unified Government and

---

[2] NPR, *Kansas City, Kansas, Police Officer Sues The City For 'Rampant' Racism And Sexism*, KCUR (December 3, 2019, 5:03 PM), https://www.kcur.org/news/2019-12-03/kansas-city-kansas-police-officer-sues-the-city-for-rampant-racism-and-sexism.

[3] The Kansas City Star, *KCK police chief had 'handshake' deal to live in county-owned house for little rent*, The Kansas City Star (*updated* December 9, 2018, 10:55 AM), https://www.kansascity.com/news/local/article222603675.html.

Zeigler created a written lease only after it was requested by a citizen.[4] At all times relevant to this Complaint, up to and including 2019, Zeigler was a supervisor of Golubski, Kill, Bye, and Ware. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30.     Defendant Michael Kill was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31.     Defendant Clayton Bye was, at all times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

32.     Defendant Dennis Ware was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of KCK and its successor the Unified Government as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

33.     Within this Complaint, Detectives Golubski, Kill, Bye, Ware, and Zeigler are collectively referred to as the "Detective Defendants."

---

[4] The Kansas City Star, *Investigation of KCK police chief looks into alleged double-dipping in lake house deal*, The Kansas City Star (*updated* March 5, 2019, 9:05 AM), https://www.kansascity.com/news/local/crime/article227106029.html.

## FACTS

### For decades, Defendants operated a government-sanctioned protection racket

34.     "It is difficult to keep a continuing criminal enterprise profitable and survive over the long term unless there is a means to protect it from law enforcement, which ultimately learns of its existence."[5] For decades, the most powerful gangs in KCK were sanctioned by, and operated under the protection of, the Unified Government itself.

35.     Defendants formed and operated an open and notorious police protection racket ("Protection Racket"). Defendants' Protection Racket protected violent gangs and criminals in KCK who sold illegal drugs and trafficked women, including minors. The Protection Racket offered drug dealers and sex traffickers (i) protection from law enforcement, (ii) advance notice of police raids, and (iii) coverups for gang murders. In exchange, the Protection Racket received money, drugs, stolen goods, and access to exploited and vulnerable women and girls.

36.     To build its power and corner the corruption market, Defendants' Protection Racket included government agents using the power of their official positions to permit, encourage, foster, and cultivate illegal activities, including the sale of crack cocaine and other drugs, gambling, trafficking in stolen goods, sex trafficking, and prostitution. "Corruption supports the ongoing existence of organized crime, because corrupt public officials protect organized criminal groups from law enforcement and disruption."[6]

37.     Golubski used his powers and privileges as a police detective to manage the Protection Racket's operation. As a result of the Unified Government's culture, Golubski was able to begin his unlawful conduct almost as soon as he graduated from the KCKPD police academy in

---

[5] *United Nations Office on Drugs and Crime*, E4F University Module Series: Organized Crime, Module 4: Infiltration of Organized Crime in Business and Government, *available at* https://www.unodc.org/e4j/en/organized-crime-module-4/key-issues/links-to-corruption.html.
[6] *Id*.

1975. Golubski covered up gang killings; received money, drugs, and women from gangs under his protection; provided advance notice of police raids; shook down lower-level street dealers to extract compensation; openly and notoriously raped and sexually assaulted non-gang citizens; and assisted in trafficking women, including minors.

38.     Zeigler was Golubski's partner and served as Chief of Police for KCKPD from 2015 to 2019. While a detective, Zeigler helped obtain false convictions and encouraged the Protection Racket's conduct, as detailed herein. While Chief of Police, Zeigler protected and enabled the Protection Racket, fostered a culture of unlawful and unethical police conduct, failed to discipline or otherwise prevent the unlawful conduct detailed herein, and otherwise ensured the conduct he knew was occurring was not stopped and instead was protected from oversight or discipline.

39.     Kill, Bye, and Ware were KCKPD detectives and aided the Protection Racket by fabricating false evidence and testimony, enforcing ultimatums and threats on innocent civilians, and shaking down drug dealers to extort and collect "protection" payments, including stolen goods.

40.     Police Chief Defendants, including Dailey, Swafford, and Miller (and Zeigler once becoming the Chief of Police) protected and enabled the Protection Racket. Despite their knowledge both of the Protection Racket's existence and its illegality, Police Chief Defendants did not just fail to stop the Protection Racket, they actively encouraged its continued operation and protected the other Defendants from scrutiny, investigation, and criminal charge. Police Chief Defendants also fostered a culture of unlawful and unethical police conduct, failed to discipline or otherwise prevent the unlawful conduct detailed herein, and otherwise ensured that the conduct each knew was occurring was not stopped and instead was protected from oversight and discipline.

41.     Defendants' Protection Racket was well known in KCK generally and to the Unified Government specifically. The Protection Racket paid employees and leadership within the Unified Government to ensure its operations and members remained untouched and undisciplined. The Unified Government's policies, procedures, practices, and culture enabled, fostered, and permitted Defendants' Protection Racket's operation and growth. Its very formation and ability to continue was a direct result of the Unified Government's own conduct.

42.     For example, police raids on known drug houses often came up empty, either because the Protection Racket tipped off drug dealers about the raids or because Defendants stole the drugs and then falsely reported that they found nothing in the raid. When KCKPD seized drugs in such raids, it was not for a law enforcement purpose – the drugs went right back on the street, with the profits flowing into the corrupt police's pockets. As long as major drug dealers kept the Protection Racket on their payroll, they were rarely, if ever, arrested. Over decades, the ability of major gangs to operate with impunity made it obvious to all that they were operating with government protection. Police Chief Defendants and others in the Unified Government either turned a blind eye, or, as was often the case, benefited from the illicit arrangements themselves.

43.     Defendants' Protection Racket also operated a network of women that the Unified Government and its employees crudely referred to as "Golubski's Girls." Golubski insisted upon a proprietary interest in these women, which was respected by the Unified Government. Their identities, how he secured them as "informants," how he managed them, and how (or whether) they provided information was never documented. Everything about "Golubski's Girls" was accepted as one of Golubski's trade secrets.

44.     The Unified Government was well aware of Defendants' illicit practices. By making the Protection Racket and abuse of the Black community the subject of crude jokes, the

Unified Government and Police Chief Defendants conveyed implicit or express approval for others to sexually assault and exploit vulnerable citizens.

### With the Unified Government's full knowledge, this criminal enterprise spent decades terrorizing the Black community, preying upon and coercing sexual acts from vulnerable Black women

45.     For decades, Detective Defendants and Police Chief Defendants were dirty cops who used the power of their badges to exploit Black women, including women working as prostitutes. Beginning as early as the 1980s and continuing for more than two decades, they haunted Quindaro Boulevard and the housing projects in the north end of KCK, hunting Black women and taking what they wanted.

46.     Defendants' Protection Racket acted as "protector" for multiple criminal organizations. The criminals empowered by Defendants' Protection Racket "engaged in kidnappings, beatings and other violent acts."[7] Killings, such as the killing of Saundra Newsom's son Doniel Quinn, were ordered and executed by organized criminals as part of their agreement with Defendants' Protection Racket. Because criminals knew that they were protected by Defendants' Protection Racket, they "knew they could [kill people] because they had Golubski on their team."[8] With a prominently placed cop as a member of the criminal enterprise, they were able to kill with impunity: "the perception was that they could do anything."[9]

47.     Detective Defendants arrested, or threatened to arrest, women, sometimes without cause and used the threat of prosecution to obtain sex acts. Golubski often told his victims that he had connections inside the Unified Government's Prosecutor's Office. Though he would

---

[7] The Kansas City Star, *Ex-KCK cop Golubski had ties to criminals, prosecutors say. Was he their 'protector'?*, The Kansas City Star (November 2, 2022, 5:00 AM), https://www.kansascity.com/news/local/crime/article267104436.html#storylink=cpy.
[8] *Id*.
[9] *Id*.

sometimes pay his victims with drugs or money, Golubski's preferred currency was threat and force.

48.     The predilections and abuses of Detective Defendants were well-known among KCKPD officers and supervisors, including Police Chief Defendants. The squad room openly joked about mistreating Black women and the many "halfbreed" offspring Golubski had likely fathered by his victims. It was widely known among KCKPD officers and supervisors, including Police Chief Defendants, that when Golubski and Zeigler were patrol partners, Golubski would arrest Black prostitutes, force them into sex acts – even at the precinct house itself – and release them without ever pressing charges. Meanwhile, it was widely known among KCKPD officers and supervisors, including Police Chief Defendants, that when Detective Defendants went out on calls, they would shake down Black drug dealers, stealing money and drugs, and release them without ever requesting that charges be brought.

49.     Golubski often fixated on particular women, harassing them for months, or even years. Once he gained leverage over a woman, he would demand that she carry out other acts for him, with his extortionate control sometimes lasting years. Always under the threat of violence or of false convictions through conspirators in the Unified Government, Defendants ensured their unlawful and illegal conduct remained concealed.

50.     Golubski and other Unified Government employees used the power of the Unified Government to force victims like Quinn to serve as "informants" or "witnesses" that he used to manufacture evidence and "clear" gang murders committed by those protected by the Protection Racket. Defendants falsely painted murders as *Black-on-Black* crime. This satisfied the Police Chief Defendants' need to give Unified Government leaders political cover; the illusion that KCKPD was battling criminals and solving violent crimes.

51.     After Golubski established his dominance, he used many of his victims as "informants" to help him "clear" cases. KCKPD officers and supervisors and the Prosecutor's Office came to expect that the women they called "Golubski's Girls" would provide critical evidence leading to convictions in many of Golubski's investigations. The Unified Government knew that the information coming from Golubski's informants was unreliable because it was the product of his coercive relationships. Nevertheless, they continued to rely upon it, and failed to disclose this conflict. The Unified Government secured convictions based (sometimes exclusively) on this knowingly unreliable, false, and coerced testimony.

52.     Defendants' Protection Racket worked closely with KCK drug kingpins, including Cecil Brooks, to protect their interests. In exchange for money, sex, or drugs, Detective Defendants fixed investigations, including making cases and witnesses disappear while framing innocent people for crimes committed by drug gangs. The drug kingpins also provided Defendants with successful drug busts to keep up appearances that KCK was aggressively pursuing illegal drugs. In reality, these were pre-arranged raids and netted minimal money, drugs, or guns. Detective Defendants' relationship with the drug underworld was also widely known in, and accepted by, KCKPD and the Police Chief Defendants. But because Defendants' network of trafficked women and drug kingpins kept "closing cases," the Unified Government approved, endorsed, and enabled the conduct to continue.

53.     Golubski was known to be especially close to Cecil Brooks, and they were often seen by the community and KCKPD speaking together, either in Golubski's car, in secluded areas, or in Brooks' office at Delavan Apartments. Brooks was known throughout KCK and the Unified Government as an open and notorious dealer of crack cocaine in the 1990s and early 2000s. The "protection" Golubski and other Defendants provided to Brooks allowed him and other high-level

drug dealers to operate large, lucrative drug enterprises and engage in violent acts to protect their interests without criminal consequences. Although Brooks was ultimately arrested on January 16, 2008, it was because of Brooks' conduct in Topeka – outside the control of the Protection Racket.[10]

54.     Detective Defendants never sought to conceal their misconduct from other KCKPD officers and supervisors, or the Police Chief Defendants. Although their corruption was common knowledge at the Unified Government, they were never reprimanded and were instead promoted, Golubski becoming a captain before his retirement from KCKPD, and Zeigler becoming Chief of Police. KCKPD officers who were disgusted by this misconduct kept quiet to avoid retaliation – Defendants had powerful friends in KCKPD (including Police Chief Defendants), Prosecutor's Office, Unified Government, and, ultimately, United States Attorney's Office for the District of Kansas.

55.     Following his retirement from KCKPD in 2010, Golubski continued conspiring with criminal gangs while working for the City of Edwardsville, Kansas' Police Department. Despite knowing that Golubski used his badge as a license to hunt Black women, no one in KCKPD or the Unified Government notified the Edwardsville Police Department of Golubski's conduct. Golubski's criminal activities have continued through today.

**Golubski used his authority as a police officer to rape Michelle Houcks**

56.     Plaintiff Michelle Houcks is one of Defendants' victims.

57.     In September 1992, in the late evening after an argument with her then-boyfriend, Houcks left his apartment and walked to Parkwood Park, off Quindaro Boulevard between Ninth and Tenth Streets, to calm down.

---

[10] FBI Press Release, *Hot Iron Drug Trafficker Sentence to 18 Years in Federal Prison*, available at https://archives.fbi.gov/archives/kansascity/press-releases/2009/kc072309.htm.

58.     At night, cruising down his favorite haunt – Quindaro Boulevard – Golubski found Houcks, vulnerable and alone.

59.     While she sat in the unlit pavilion at the park, Golubski drove up, got out of his car, walked toward her, and identified himself as a police officer. Although he was in plain clothes and exited from an unmarked police car, he showed her his badge, and she could see his weapon holstered on his side. After asking and receiving Houcks' name, Golubski asked why she was in the park. Houcks explained she was calming down after a fight with her boyfriend.

60.     Golubski said it was too dangerous for Houcks to be in the park at that hour and insisted that she let him drive her home. Because she knew Golubski was a police officer, Houcks felt safe getting into the car for the offered short ride home.

61.     But instead of driving her home, Golubski turned the opposite direction on Quindaro Boulevard and drove Houcks toward the "north end." When Houcks asked where they were going, Golubski told her he had to make a stop. Turning right on 27th Street, Golubski drove past Cecil Brooks' Delavan Apartments near 2420 Delavan Avenue. Golubski finally stopped the car by a wooded area with a small, secluded field. Other than claiming he "had to make a stop," Golubski was silent the entire drive.

62.     Figure 1 is the path Golubski drove after luring Houcks into his police car:



(Figure 1).

63. Golubski told Houcks to get out of the car, and then ordered her to perform oral sex. Houcks froze. Golubski reiterated his command, telling her to "suck my dick." Houcks was cemented in place as fear that Golubski would physically harm or kill her raced through her mind. Golubski grabbed Houcks by the throat, began squeezing it, and pushed her until she fell into the back seat of Golubski's Unified Government-issued unmarked police car.

64. Golubski kept his grip on Houcks' throat with one hand while pulling at her skirt with his other hand. Houcks attempted to push his hand away, but Golubski commanded her to "stop fighting!" Without taking off his pants and while still wearing his badge and gun, Golubski pulled out his penis. When Houcks screamed "why are you doing this?", Golubski calmly replied, "because I can." Golubski pulled down Houcks' skirt and underwear and vaginally raped her. Golubski then forced Houcks to turn over onto her stomach and anally raped her. During the course of the attack and rape, Houcks felt pain and shame, and she cried and pleaded for Golubski to stop.

65.     Eventually Golubski stood back up and ordered Houcks to "now suck," while gesturing at his penis. Houcks continued to cry and said she did not want to. Unhappy, Golubski grabbed the back of her head and forced her to perform oral sex so forcibly that it hurt the back of her throat.

66.     Golubski then zipped his pants back up, readjusted his badge and gun, and told Houcks to fix her clothes and get into the back of his police car. Houcks complied, and Golubski drove Houcks back to Parkwood Park. During the drive, Golubski warned Houcks to keep her mouth shut, taunting "who would believe you over me?" After Houcks exited Golubski's police car, he sternly offered a final admonition: "Remember what I said; keep your mouth closed."

67.     After seeing Golubski turn the corner and drive away, Houcks sat down on the concrete parking lot, alone, and sobbed. Fearful Golubski may return, Houcks painfully made her way back to her boyfriend's apartment. Houcks attempted to hide any outward appearance of the rape from her boyfriend.

68.     The next day, a Missouri resident, Houcks traveled across the state line to Truman Medical Center, where a rape kit was utilized. Medical staff at Truman Medical Center told Houcks that they were calling the Kansas City, Missouri police so she could file a police report. Terrified by what she had just experienced, Golubski's threats, the violence of the rape, his badge, and his gun, Houcks fled the hospital before police could arrive.

69.     Approximately two months later, during daytime, Houcks was back in KCK visiting a friend. While walking along the street, a car pulled up next to Houcks, and Houcks saw Golubski exit the driver's side while another officer remained in the car. Golubski walked around the front of the car, and confronted Houcks on the sidewalk, calling her by her full name. Golubski demanded to know whether Houcks had told anyone. After telling him no, Golubski told Houcks

that he knew her brother, used his full name, and said Houcks needed to keep her mouth shut or something bad would happen to her or her brother. Golubski threatened to "put a case" on Houcks' brother.

70.    During the entire interaction, the second police officer sat in the passenger side of Golubski's police car, but never appeared to look out the window at Houcks or make eye-contact while she was being threatened by Golubski.

71.    Houcks was surprised that Golubski knew so much about her and her family. She had only told Golubski her name once, when she first saw him at Parkwood Park before he kidnapped and raped her. Moreover, Houcks had never mentioned that she had a brother, let alone revealed his name.

72.    Terrified, Houcks concealed what happened. She never told anyone about Golubski. And although she told her mother that she had been raped, Houcks lied to her and claimed that it was by two Black men. Fearful of what Golubski may do to her, her mother, or her brother, Houcks was careful to ensure that no one knew she was raped by a police officer, let alone Golubski.

73.    Houcks remained silent and fearful for over thirty years, telling no one what happened that night. After reading *The Kansas City Star*'s coverage of Golubski in 2021, Houcks contacted editor Melinda Henneberger, but stipulated she would only tell her story anonymously, with no identifying information in print. On October 24, 2021, Houcks' anonymized story appeared in *The Kansas City Star*. Prior to publication, Houcks agonized over the text and cover art for the story to ensure that nothing in the piece could reveal her identity.

**Defendants and their Protection Racket conspired to murder Saundra Newsom's son, then used the hope of an investigation as leverage to sexually harass Newsom**

74.    Plaintiff Saundra Newsom is another one of Defendants' victims.

75. On April 15, 1994, Neil Edgar Jr., better known as "Monster," murdered Doniel Quinn and Donald Ewing in broad daylight with a shotgun as they sat in a parked car on a busy neighborhood street. Monster, who was seen by numerous people, simply walked away. Monster was well known as a loyal foot soldier for Cecil Brooks who killed for money and prestige. Brooks and Monster were protected by Defendants' Protection Racket.

76. The double murder was indeed a planned hit: Monster was paid $5,000 to kill Quinn. Ewing was simply in the wrong place at the wrong time. Brooks suspected Quinn of stealing drugs from one of Brooks' stash houses because drugs disappeared when Quinn fell asleep while watching the stash house. By making Quinn's execution so brazen and public, Brooks sent a message to other would-be thieves. When the killing was planned, Golubski and the Protection Racket were responsible for the cover up and for framing someone for the crime.

77. The plan worked. Brooks and Monster were never charged with the killing. Indeed, Defendants intended to avoid investigating the murders at all.

78. Doniel Quinn was Newsom's only son, and his murder devastated her. But Doniel's murder did not just affect Newsom. He had a fiancée and a son of his own. He was starting an organization, "Men Making A Difference," which aimed to help men after exiting drug rehab to pull their lives together and become productive members of society. Doniel had enrolled in classes at Donnelly College.

79. Newsom learned her son was murdered while standing in her driveway, where she immediately fainted. But it was not the Unified Government who told Newsom that her son had been murdered. In fact, Newsom was *never* notified by the Unified Government that her son was murdered in cold blood.

80.   As days turned into weeks and Newsom *still* had not been contacted by the Unified Government, she attended a Board of Commissioners meeting to find out why. When the Mayor announced the public comment portion of the meeting, Newsom asked her pointed question:

> *"I want to know why a mother in Wyandotte County had to*
> *find out from a crackhead that her son was killed."*

81.   Speaking for the Unified Government, then-Mayor Joe Steineger, Jr. stumbled around, claiming he was not prepared to talk about that now, but asked an aide to take down Newsom's phone number to schedule a meeting to discuss the matter. The following Thursday, Newsom found herself waiting outside the Mayor's Office at City Hall.

82.   Newsom heard the Secretary announce her arrival, and Mayor Steineger walked up, his arms already outstretched as he asked "may I give you a hug?" Newsom politely said no, causing Steineger to drop his arms, but he withheld a handshake. "Let's go in here," Steineger said, motioning toward his office.

83.   As they walked in, Newsom saw a long conference room table with roughly 14 chairs. In the room, a group of 6 men were talking. Steineger told Newsom to "have a seat," and Newsom sat in the second chair from the end, on the side closest to the door. After doing so, everyone selected a seat at the other end of, and across from, Newsom:



84.     Steineger introduced the meeting's attendees, which comprised Steineger, the City Administrator, Chief of Police Dailey, a tall, young, white KCKPD officer in uniform, KCKPD's Sonny Callahan, and Golubski. Newsom looked down the row of faces staring at her and noticed Steineger was fidgeting with a pencil in his hands.

85.     Newsom began: "I just want to know, why is it that a mother in Wyandotte County doesn't have a right to know that her son was killed, and nobody from your office came to talk to me?"

86.     The City Administrator, in a condescending tone, retorted "Ms. Newsom, where is it that you live that you think that you should have been notified?" Newsom was shocked: "What does where I live have to do with notification? And I live on 24th Street."

87.     Unsatisfied, the City Administrator continued in a raised voice, "What, you live on 24th and Quindaro?"

88.     Newsom took a breath and responded "I didn't say I live on Quindaro. I live on 24th Street in West Heights."

89.     When Newsom said she lived in the affluent, (almost) all-white neighborhood of West Heights, she heard a *snap* that drew her attention to Steineger, who was holding a broken pencil. Newsom is, and for decades has been, one of only two Black families living in West Heights on 24th Street. Newsom then watched Steineger begin fanning his hand toward the City Administrator, and the City Administrator went quiet. Newsom was then given the opportunity to express her frustration with the Unified Government's failure to notify her of her son's death.

90.     Walking out of City Hall, Newsom was more confused and angry than when she arrived. Why did the City Administrator so closely question her about where she lived?

91.     Days later, Newsom was sitting on her front porch, mourning her son's death and praying for guidance and meaning, when she watched an unmarked police car pull up to her house. Then a man, whom she thought she recognized from her meeting at City Hall, climbed out of his car and began walking toward her. While he was still several yards away, Newsom could smell his cologne. His hair was slicked back and his body adorned with gold jewelry: a gaudy watch, bracelet, and oversized rings on both pinkie fingers. He wore an uncollared shirt that was partially unbuttoned, revealing his chest and a gold necklace.

92.     The man walked up her driveway with the familiarity of an invited old friend. Without saying a word, he climbed the stairs from her driveway. Crossing her sidewalk, he climbed the steps up onto Newsom's porch and finally spoke: "How you doin'? I'm Detective Golubski."

93.     As he settled into a chair 3 feet from Newsom, he continued "I'm working on your son's case." Newsom acknowledged she recognized him from the meeting in the Mayor's Office. Adjusting himself, Golubski made his badge and his firearm obvious, allowing Newsom to confirm he was officially a police officer.

94.     Settled into the chair, Golubski said "I think we got us a suspect." It was the first time Newsom had ever heard the Unified Government was investigating her son's murder.

95.     "So I'll be getting back to you, to let you know how the case is progressing." Despite this otherwise positive news, Newsom could not get past the unease she felt near this man, and the invasion of privacy she felt from his entering – without invitation – onto her porch.

96.     Newsom looked up and realized that Golubski was leering at her. He leaned forward in his chair, now a foot separating them, and with an entitled tone asked, "By the way, what is a fine lady like you doin' sitting out here on a Friday night? It's a beautiful night." Newsom could not believe what she had just heard. Assuming she misunderstood the advance, she looked

at Golubski. But his ogling up and down her body, undressing her with his eyes, confirmed that she had correctly understood Golubski's sexual advances.

97.    Newsom wanted to get up and escape into her house, but she was afraid Golubski would follow her inside. So, she said nothing and simply stared back at him.

98.    Finally, after several minutes of silence, Golubski spoke again. "By the way," he winked, "you ever think about dating a white police officer?"

99.    Growing angry and indignant that Golubski would interrupt her prayer and mourning, Newsom bluntly responded, "Hell no."

100.    Golubski feigned apology, saying "my bad" and "sorry," but kept leering at her. Golubski made no effort to conceal that he was looking her up and down, making clear that he had the power to take what he wanted.

101.    Newsom was afraid and felt dirty, uncomfortable, and degraded. Minutes passed while Golubski leered, and Newsom, with nowhere to escape, stared back.

102.    Finally, Golubski stood up, mentioned he would return when he had a case update, and said he was "going to get back on these streets." Newsom watched him as he walked down her steps, her driveway, and up the street to his car. Golubski then sat in his car for several more minutes before driving away.

103.    Newsom sat on her porch in disbelief, trying to make sense of the event; a blatant, sexual advance by the police detective charged with investigating her son's murder. Again and again, Newsom replayed the event in her mind. Each time, she was retraumatized by the terror of a police detective brazenly leveraging her son's murder to force sexual favors from his mother.

104.    But in lieu of conducting a real investigation of Doniel's murder, Defendants conspired to falsely convict an innocent man, LaMonte McIntyre. Although Defendants knew the

identities of the real killers, and that McIntyre was innocent, Defendants needed a scapegoat to further the interests of Defendants' Protection Racket.

105.   As Doniel Quinn's public execution sent a message to the Black community, McIntyre's false conviction reinforced the message. The murder was covered up in broad daylight, ensuring citizens of KCK understood Defendants' power over their lives. McIntyre's conviction reinforced the understanding that Defendants held the power of life and death, freedom and incarceration, over KCK's Black community, including Newsom.

106.   Following Doniel Quinn's murder, Newsom was told by multiple eyewitnesses that McIntyre was innocent. But despite Newsom's pleas that her son's murderers be found and prosecuted, the Unified Government could not be persuaded to conduct a real investigation into Newsom's son's murder.

107.   The Unified Government not only knew that LaMonte McIntyre had not murdered Newsom's son, but it also knew that the Protection Racket had set up McIntyre as the killer in furtherance of its corrupt agreements with organized criminals. The Unified Government participated in the Protection Racket's wrongful conduct by using its authority, under color of state law, to aid in protecting Newsom's son's killer, which enabled and resulted in the murder itself.

108.   When Newsom met with Unified Government officials in the Mayor's office, and when Golubski came to visit her, she did not know that Golubski was part of a conspiracy to kill her son or that Golubski was protecting her son's murderers by framing Lamonte McIntyre. She did not learn of this until later. Consequently, Newsom was left replaying Golubski's sexual advances and wondering whether enduring Golubski's advances would have brought about an investigation by the Unified Government of her son's murder and prosecution of his killers.

109.    In addition to using the Quinn-Ewing murders to gain leverage with Newsom, Golubski also used them for leverage with Rose McIntyre. This injustice has haunted Newsom for decades while she has been frustrated in her demands that her son's real killers, men protected by Golubski, be brought to justice.

110.    The next time Newsom saw Golubski was before she testified in an attempt to get McIntyre's wrongful conviction overturned. As she walked into the courtroom to testify, Golubski made eye contact and winked at her. This reinforced Newsom's fear of Golubski's control and power over her and her son's case.

111.    McIntyre has since been exonerated, and on June 30, 2022, the Unified Government approved settlement of the McIntyres' federal Section 1983 action for $12,500,000.[11] Yet despite the settlement of the McIntyre case, Defendants have yet to admit their wrongdoing or bring the killers of Quinn and Ewing to justice. Far from it, the Unified Government's refusal to admit "to any wrongdoing" in the wrongful conviction of McIntyre is coupled with the public announcement of Commissioner Gayle Townsend that she only "sadly" voted to approve the settlement.[12]

112.    Defendants and its Protection Racket are responsible for the wrongful death of Newsom's son Doniel, who was killed as a part of and pursuant to an agreement that the Protection Racket would use Unified Government police badges to protect killers. The wrongful death of Newsom's son resulted from actions taken by Defendants under color of State law that deprived Newsom of her recognized liberty interests without due process of law.

113.    Thirty years later and with multiple eye witnesses, there's still no conviction for Quinn's murderer. The Unified Government has created a "Community Integrity Unit," which the

---

[11] NPR, *Unified Government to pay $12.5 million to wrongfully imprisoned Kansas City, Kansas, man*, KCUR (June 30, 2022, 9:28 PM), https://www.kcur.org/news/2022-06-30/unified-government-to-pay-12-5-million-to-wrongfully-imprisoned-kansas-city-kansas-man.

[12] *Id.*

District Attorney claimed was born out of the McIntyre wrongful conviction. Speaking on behalf of the Unified Government, the District Attorney acknowledged "Do I know that there is a problem? I do."[13] But nothing has been done, and Quinn's murderer remains uncharged for his crime, and Quinn and Newsom remain without justice.

### In furtherance of Defendants' scheme to cover up the Quinn-Ewing murders, Golubski and Ware exploited Niko Quinn and forced her to give false testimony; years later Golubski sexually assaulted Quinn

114. Plaintiff Niko Quinn is another one of Defendants' victims.

115. For decades, Quinn despaired that the power and influence that had always protected Golubski would continue protecting him and deprive his victims of justice. Despite public disclosure of Quinn's knowledge of KCKPD corruption, and of specific acts of evil done by Golubski, it seemed to Quinn that no one cared.

116. The Kansas City Star published new stories reporting that Quinn witnessed Golubski with several women who were later found murdered, only days before they disappeared. But no one connected with Kansas or Federal law enforcement seemed to take notice, and no one came to her seeking an interview.

117. The September 14, 2022 Indictment charging Golubski with raping Williams and another woman, S.K., and the November 14, 2022 Indictment of Golubski and others, charging them with organized kidnapping and raping of young women in a safehouse controlled and protected by KCKPD, gave Quinn her first hope that Golubski and the Unified Government might, someday, be held responsible for their actions.

---

[13] Kansas City Star, *Wyandotte County District Attorney discusses the birth of the Community Integrity Unit* (September 24, 2022, 6:22 PM), https://www.kansascity.com/news/local/crime/article266068786.html.

118.     Since the filing of the two Indictments, Quinn has followed the criminal cases, has attended hearings at which she has seen Golubski, and has read papers filed by the Government in those cases, including the two Indictments and the Government's September 17, 2022 Memorandum and Proffer in Support of its Motion for Pretrial Detention.

119.     Reading filings in Golubski's criminal cases, seeing and being in the physical presence of Golubski, and participating in the drafting of the instant civil Complaint has confronted Quinn with new, intrusive, and distressing memories that recur and make it difficult for her to separate her present memories from memories she has held, but repressed, over time. This makes it difficult for Quinn to separate what she now remembers from what she remembered before the September 14, 2022 Indictment was filed.

120.     As a child, Quinn was first exposed to Golubski and the KCKPD Protection Racket through her uncles, who were drug traffickers themselves. Quinn was frequently told to steer clear of KCKPD generally and Golubski specifically; that Golubski was corrupt, a snake, and a dirty cop; and that despite threats, suspicious deaths, and police raids, Quinn's uncles had refused to pay for the Protection Racket's protection.

121.     Quinn was also exposed to the physical brutality of KCKPD firsthand. For example, in approximately 1975, she watched KCKPD beat up her mother, despite her mother being the victim of kidnapping by an escaped prisoner. When her uncle tried to intervene and stop the abuse, KCKPD pulled a gun on him and threatened to shoot him – all in front of Quinn. Even as an adult, Quinn continued to see KCKPD's violence as they beat up random Black men. One time, after beating a defenseless man, a KCKPD police officer threw $2.00 on the body, now curled up in the fetal position, and sneered "now nigger – go buy you a 40."

122.     Then came the first rape. In roughly 1986, Quinn's sister Stacey, 16 at the time, was picked up by a KCKPD police officer, who offered her a ride home. Instead, he raped her. The officer? Golubski. From that moment forward, Stacey became one of "Golubski's Girls." Golubski used Stacey for information, raped her, and gave her drugs (keeping her addicted and controllable). Until, ultimately, Stacey was murdered too, under suspicious circumstances that recently received local reporting.[14]

123.     On April 15, 1994, Quinn witnessed the Quinn-Ewing double-murder detailed above. Niko Quinn was a first cousin to Doniel Quinn and one of several people at the scene of the murders and could describe the killer. When asked to describe the shooter, Quinn gave KCKPD a detailed description, including the killer's height, build, and clothing. The man she described was Monster. But to protect Brooks and Monster, and further the power and influence of the Protection Racket, Defendants extorted Quinn and falsely pinned the murders on Lamonte McIntyre.

124.     Within 8 hours of the shooting, KCKPD, with Golubski at the scene, arrested McIntyre.

125.     The following day, Golubski, Ware, and other unknown KCKPD officers went to Quinn's home. There, they attempted to force, or lead Quinn into, a false identification of McIntyre as the shooter. The interview was designed to elicit testimony that they knew was false, so they could use it to frame McIntyre. Golubski and Ware showed Quinn an improperly suggestive photo array that omitted Monster. When Quinn was unable to identify the shooter, Ware held up LaMonte McIntyre's photo and showed her his name, and loudly instructed "you know who it is." Quinn

---

[14] NPR, *Black women say KCKPD detective Roger Golubski prayed on them for decades. Stacey Quinn was one* (October 26, 2022, 4:00 AM), https://www.kcur.org/news/2022-10-26/black-women-say-kckpd-detective-roger-golubski-preyed-on-them-for-decades-stacey-quinn-was-one.

understood she was being directed to choose McIntyre. Quinn continued to refuse to make the false identification. At the end of the meeting, Quinn was given Golubski's business card.

126.     To hide their misconduct, Golubski and Ware falsified details of this identification procedure in their written and oral reports and failed to disclose the suggestive and coercive nature of the procedure to McIntyre and his defense counsel. Upon information and belief, KCKPD supervisors – including its Chief of Police – with full knowledge, approved these false reports.

127.     Roughly a week after the murder, Golubski forced Quinn to meet with him behind the Wyandotte High School track. Fearing for her safety, Quinn had a male friend drive her to the meeting, which she insisted be held during the day. During the meeting, alone in Golubski's car, Quinn told Golubski that she had identified the shooter as Monster, and that she had heard from multiple people that Monster committed the murders at the behest of Brooks. After listening to Quinn, Golubski threatened, "I'm going to tell you this; it's best that you not say too much about Brooks, because they found his ex-girlfriend's remains in a park by Washington High School." When Quinn persisted, desperate for the killer to be brought to justice, Golubski repeated his threat: "You shouldn't say Brooks' name, because something can happen to you."

128.     Golubski insisted to Quinn that he already had the killer, the gun, and his clothes and repeatedly reassured Quinn that the Unified Government had the right killer. Golubski told Quinn that McIntyre was the killer. During the meeting, Quinn complained that people were pounding on the doors of her home, but when she looked outside, no one was there. Instead, she would see cars full of men sitting outside her home, watching. Golubski first claimed that this was McIntyre's family. Quinn immediately rejected this explanation, knowing she had never associated McIntyre with the shooting. Finally, Golubski offered to see if he could find her a new apartment.

Quinn found this to be a strange response from a police detective. Golubski ended the meeting by noting he knew the prosecutor, and they would be in contact with Quinn.

129.     Shortly after the meeting, Quinn was contacted by the Unified Government's Housing Authority, who requested that Quinn fill out some paperwork. Once completed, Quinn was moved into a new apartment.

130.     Approximately a month or two after being moved into her new apartment, Quinn learned Unified Government Assistant Prosecuting Attorney Terra Morehead and Golubski went to Quinn's relatives' homes where they left a chilling message to be relayed to Quinn: If Quinn did not contact Morehead "sooner than later," they would take Quinn's children away, who would never again be seen by Quinn.

131.     In response to the threats, Quinn went to Morehead's office. In the interview room, the table was full of pictures. Quinn informed Morehead that McIntyre was not the killer. Morehead coldly replied that they had evidence that he was. Then Morehead pulled out graphic photographs from the Quinn-Ewing murders and asked "Don't you want someone responsible for this? Don't you want someone charged for this?" Quinn replied, "The right person." Morehead reiterated Golubski's lie, claiming KCKPD caught the right person and they possessed all of the evidence that he killed Quinn and Ewing. Morehead also pulled out graphic photographs of Quinn's uncle's murder and autopsy photographs and forced Quinn to look at them.

132.     Morehead ended the meeting by stating she would be in touch, but she reiterated the threat: Quinn would be put in jail and her children taken away if she failed to identify McIntyre as the killer. Incredibly, Morehead even accused Quinn of knowing that McIntyre was the killer, but that Quinn was covering it up to protect McIntyre for murdering her cousins. Quinn was 20 years old.

133.    Golubski, Ware, Morehead, and the Unified Government coerced Quinn into falsely identifying McIntyre using a combination of threats of physical harm, threats against her children, and promises of financial help. Quinn, who was afraid of Golubski, KCKPD, and the Protection Racket and who believed she had no other choice, finally relented.

134.    During a hearing in McIntyre's criminal case, Quinn waited with Golubski in a witness room just outside the courtroom. Golubski brought up Quinn's employment as a dancer and told Quinn he wanted to see her strip naked and dance on the conference table for him. Golubski told Quinn that if she did what he wanted, he could make Quinn's life a lot easier. Quinn's sister Stacey walked into the room. Seeing them both, Stacey got into Quinn's face and told Quinn to stay away from Golubski because he was "the devil." Quinn looked at Golubski, who smirked. When she was called into the courtroom, Quinn saw McIntyre in person for the first time. She instantly knew that McIntyre was not the shooter; McIntyre was the wrong size and had different facial features.

135.    Before trial, Morehead met with Quinn again. Quinn, having seen McIntyre at a prior hearing, repeatedly and vehemently denied that McIntyre was the shooter. Quinn insisted that McIntyre was taller and had different facial features than the man who killed her cousins. Morehead rejected each attempt and instead told Quinn she would ask very direct, leading questions designed to force Quinn to identify McIntyre as the shooter. When Quinn rebuffed the strategy, Morehead threatened "this is how it's going to be done, or I'll send someone to get your kids and you'll be put in jail for perjury." This meeting occurred within the Unified Government's offices. Morehead explained she could arrest Quinn and hold her in jail until it was time to go to court, *because she had done this before to other witnesses*. Morehead repeated her threat that

Quinn would be jailed and would lose her children if she did not identify McIntyre on the witness stand at trial.

136.    During McIntyre's trial, Morehead came into a witness room to tell Quinn it was her turn to testify. Knowing McIntyre was not the killer, Quinn balked at making the false identification. Quinn again stated that McIntyre was too tall, and his ears were too big. Morehead reminded Quinn that they were going to do what they discussed in her office; she would ask direct, leading questions about Quinn's prior testimony in a prior hearing. Morehead then again threatened Quinn, stating: "If you don't do what we discussed, I'll throw your Black ass in jail. I'll send them to get your kids, and you'll never see them again." Quinn believed Morehead's threats that she would be punished and would lose her children if she failed to identify McIntyre as the killer of her cousins Doniel Quinn and Donald Ewing. She also believed McIntyre's conviction was inevitable, and she would not be able to do anything to stop it from happening.

137.    Because of Morehead's and Golubski's threats, their status as prosecutor and KCKPD detective, and Golubski's reputation in the community (including his conduct with Quinn's own family), Quinn reasonably believed that Defendants would do as they threatened. Quinn believed in Golubski's power, as reinforced by Morehead's coercive conduct. As a result, Quinn lied under oath, contributing to McIntyre's wrongful conviction and incarceration. Since then, Quinn has been forced to live with the burden of the consequences of her perjury.

138.    After testifying that an innocent man murdered her cousin – and doing so solely because she believed Golubski's and Morehead's threats – Quinn walked home and attempted to commit suicide. Over the following years, Quinn's guilt led to other suicide attempts.

139.    From the first time Golubski interviewed her in 1994 until roughly 2012, Golubski actively stalked Quinn. He would appear unannounced and uninvited on Quinn's front porch early

in the morning or late at night. He would stop his car on the street when he saw Quinn walking, would walk next to her, and make unwanted and unsolicited sexual advances. Neighbors and gangs in the area, based solely on Golubski's public and unwanted attention, incorrectly suspected that Quinn was a paid informant or a police snitch, resulting in threats against her. Despite repeatedly rejecting Golubski's advances, his harassment did not stop. Quinn was repeatedly forced to move in unsuccessful efforts to avoid Golubski. Repeatedly, Quinn abandoned all of her property in attempts to flee Golubski. But Golubski always hunted her down.

140.    For example, although Quinn tried shopping for groceries in the middle of the night in Shawnee Mission, Kansas or the northland of Kansas City, Missouri, Golubski found her on multiple occasions. Sometimes he followed her around the store. Other times he would allow her to see that he was watching her while she shopped or walked alone to her car and loaded the groceries into it. Quinn lived in a constant state of fear that she would be abducted by Golubski at any time, and that she was never safe from his reach.

141.    Though she remained fearful, Quinn's conscience forced her to come forward to tell McIntyre's family the truth, that her identification of McIntyre had been coerced. Her recanted testimony was a basis for McIntyre's exoneration in 2017, and the settlement of his civil rights action in 2022.

142.    Quinn continued witnessing what Golubski, unpunished by the Unified Government, KCKPD, or the courts, did to women. For example, in January 1998, Monique Allen summoned Golubski, who she described as "my trick," via a phone call from Quinn's home. Quinn

watched Golubski drive by her home in his Unified Government-issued car and Allen disappeared. The next day, Allen was found bludgeoned to death. No one was ever arrested for Allen's murder.[15]

143.   Months later, Quinn watched Golubski pick up Rhonda Easley Tribue, a known "Golubski Girl." Quinn heard Tribue call Golubski, and ask "you going to come get me? I'm at Nikki Quinn's." When Quinn objected to anyone sending the police to her house, Tribue assured her that she always walks down the street to be picked up by an alleyway. Sitting on Quinn's front porch, Quinn and Tribue watched Golubski slowly circle the block around Quinn's house in his Unified Government-issued car. After the second drive by, Tribue said it was "time for me to go," got up, and walked down the street toward Golubski's car. Quinn then watched Golubski, with Tribue crouching in the passenger seat, drive back down the street in front of Quinn's home. It was the last time Quinn saw Tribue alive. Days later, her body was found in the road of the 500 block of South 94th Street – the border between KCK and Edwardsville. The autopsy showed Tribue died from multiple blows to the head and extremities, and noted indications that her body was dragged.[16] It is reported that the FBI believes Golubski murdered Tribue,[17] and a $50,000 reward has been offered.[18]

144.   In approximately 1996, Quinn's sister Stacey was kidnapped and left in Minnesota. She was found naked and had been severely beaten. Although Stacey claimed it was a random

---

[15] Kansas City Star, *Murdered KCK prostitutes all connected to one man: police detective Roger Golubski* (Updated November 1, 2022, 11:59 AM), https://www.kansascity.com/opinion/opn-columns-blogs/melinda-henneberger/article250297794.html.

[16] NPR, *FBI Seek Help in Kansas City, Kansas Woman's Death, A 22-Year-Old Cold Case* (March 8, 2021, 4:34 PM), https://www.kcur.org/news/2021-03-08/fbi-seeks-help-in-kansas-city-kansas-womans-death-a-22-year-old-cold-case.

[17] Kansas City Star, *Feds think KCK cop, 'a player in a much bigger operation, killed Rhonda Tribue himself* (February 2, 2022, 9:24 AM), https://www.kansascity.com/opinion/opn-columns-blogs/melinda-henneberger/article257940788.html.

[18] Rhonda Tribue, Homicide Victim, Seeking Information, https://www.fbi.gov/wanted/seeking-info/rhonda-tribue.

truck driver, it was apparent to Quinn that Stacey was not being honest and was hiding the truth. In roughly 1997-1998, Stacey again disappeared. When Stacey reappeared without notice, she looked like she'd just given birth. When pressed for details, Stacey said she had been in prison, where she gave birth to a baby that was taken from her. Stacey said she had no idea what happened to her baby. Quinn heard multiple people on the street tell her that Golubski fathered a child with Stacey. To this day, Quinn has been unable to locate Stacey's child.

145.    In 1999, Quinn visited Stacey in the Unified Government jail where Stacey told Quinn that a KCKPD officer walked in on Golubski having sex with her in his office at the KCKPD headquarters.

146.    Stacey's murder on January 16, 2000 devastated Quinn, who attempted to cope with her loss through alcohol. After getting into an argument with a KCKPD officer about him shooting at a scared child who was running away, Quinn was roughly subdued, resulting in her shoulder being popped out of joint and a subsequent panic attack. After being thrown into the back of the patrol car, the officer crudely sneered "If there's nothing wrong with you, I'll beat your fucking ass." Not knowing the officer, Quinn filed a complaint with KCKPD's Internal Affairs.

147.    Later, Quinn was sitting in her car outside of a relative's home, already extremely drunk at 2:00 pm. Golubski, in a Unified Government-issued car, pulled up next to Quinn, rolled down his window, and ordered Quinn to follow him. Quinn tried to avoid the interaction and accused Golubski of trying to set Quinn up by making her drive drunk. Golubski laughed, assured her he wasn't trying to set her up, and said "I just need to talk to you." When Quinn offered that they could talk right there, Golubski said they needed to go somewhere more private, and turned his car around for Quinn to follow.

148.    Figure 2 is the path Golubski drove after ordering Quinn to follow him in his police car:



(Figure 2). Golubski drove to Quindaro Park and parked his car by the restrooms, on the hill that overlooks Interstate 635. Golubski ordered her into his car, and he cautioned her to dismiss her Internal Affairs investigation. Otherwise, threatened Golubski, they would let the man who killed Stacey walk free.

149.    Quinn cannot remember much of the subsequent assault. She remembers wrestling Golubski in a futile attempt to get him off of her. She remembers Golubski putting on a pair of black gloves. She remembers a black baton, like a police nightstick, roughly a foot long with a cord at the end to slip over his wrist and a silver handle. She remembers repeatedly pleading for Golubski to stop, crying out that it hurts.

150.    Despite these limited memories, Quinn still endures the pain, suffering, and shame from the assault. And Defendants' repeated threats to Quinn and her children have forced Quinn

to keep her assault secret for decades. Although Quinn's consciousness required her to speak out about McIntyre's wrongful conviction, Quinn was careful to always omit the brutal attack she suffered in Quindaro Park. Even to today, Quinn remains paralyzingly fearful that by revealing she was a victim of Golubski's sexual predilections, her and her children's safety are put into jeopardy.

151.    After the attack, Golubski frequently discouraged Quinn from trying to clear McIntyre's name and expressly told her to avoid mentioning Brooks or Monster. He also repeatedly confronted Quinn about the men she was dating and would threaten that he could not "protect" her if she continued dating them. These threats, coupled with the knowledge of what Golubski had done to other women – and to Quinn herself – have left Quinn in a constant state of fear for her and her children's wellbeing.

152.    In 2012, Golubski pulled Quinn over while she was driving on Washington Boulevard. Golubski instructed her to drive to the federal United States Postal Service parking lot at 550 Nebraska Avenue. Quinn complied. In the parking lot, Golubski threatened Quinn that her ex-boyfriend was a police snitch. Golubski then said, "I'm mad at you because you told on me." Quinn understood Golubski was referencing her testimony in McIntyre's exoneration, but denied knowing what Golubski was talking about. Golubski merely smirked, stared at her, and then left.

**Golubski falsely accused Ophelia Williams' twin sons of murder to protect organized criminals and to gain access to her so he could rape and sexually assault her**

153.    Plaintiff Ophelia Williams is another one of Defendants' victims.

154.    Upon information and belief, prior to August 1999, Golubski targeted Williams for sexual assault.

155.    On August 3, 1999, Wilbur and Wilma Williams, unrelated to Ophelia Williams, were found shot to death in their home.

156.    On August 5, 1999, police located the murder victims' burned out 1992 Dodge Spirit in a parking lot.

157.    On August 7, a police informant identified four teenagers who had been in the car. Under police questioning, two of the teenagers said they got the car from Williams' identical twin boys: Ronell and Donell.

158.    On a Saturday morning, August 8, and based solely on the story of the two teenagers who had been seen in the stolen car, between 6:00am and 7:00am and with Golubski at their head, a team of KCKPD officers served a search warrant at Williams' home. Williams and her four children, twin sons Ronell and Donell, age 14; Ortez, age 13; and Samantha, age 12, awoke to loud pounding at their front door.

159.    Putting a housecoat over her nightgown, Williams answered the door to find a platoon of police officers with a search warrant, demanding immediate entry into her home. Allowed in, they took Williams' three sons into custody in squad cars and transported them to police headquarters. Golubski told Williams that she was not allowed to see or talk to them but could see them later. When her twin sons walked out the door over 24 years ago, it was the last time Williams would be alone with them. The three boys were whisked downtown for interrogation. Without the presence of Williams, a guardian, or a lawyer, each of the boys faced police questioning alone. Williams, who had been lied to about their whereabouts, searched for them but could not find them.

160.    During the police search, Williams was ordered to sit with her 12-year-old daughter and Golubski in the front room of her home. Golubski was in plain clothes, with a firearm visible in his hip holster. Williams asked questions trying to understand what was happening. Golubski, openly staring at Williams' body, gave no answers. Instead, Golubski told Williams she was

attractive, complemented her legs, and told her that he expected 12-year-old Samantha to grow up and look just like her.

161.    No evidence of the double-homicide was found in the house. Williams' home was next to a large, vacant field. Upon information and belief, KCKPD did not search this field. Instead, Golubski's team claimed to find shell casings in the small backyard that matched the type of gun that fired the bullets that were found in the victims' bodies.

162.    While Williams and Samantha endured Golubski ogling at them and commenting on their bodies in their living room, downtown, police were busy interrogating Ronell, Donell, and Ortez. The twin 14-year-olds were offered a *quid pro quo*: if they confessed to the murders, police would release their 13-year-old brother. Under intense police interrogation, without a parent, guardian, or lawyer, and convinced by KCKPD's offered *quid pro quo* that it was the only way to ensure that Ortez was released, the twin 14-year-olds confessed.

163.    In fact, as Defendants well knew, the Williams couple had been killed by Cecil Brooks' hitman, Monster – just like the Quinn-Ewing murders. Defendants blamed the murders on Ronell and Donell to cover-up the crime, and protect Monster and Brooks. Golubski also intended to use the charges against Ronell and Donell as leverage to gain control over Williams in order to sexually abuse and enslave her – just like Golubski did to Rose McIntyre.

164.    Several days later, Golubski returned to Williams' home during school hours, when he knew Williams would be alone. He reintroduced himself as the police detective working on her sons' case and told Williams he could help them. This was a lie; Zeigler, not Golubski, was assigned to the case. Golubski refused to sit until Williams did. Once Williams sat down, Golubski sat down next to her. Then Golubski began moving closer and said he knew people who could help her sons.

41

165.    With his firearm again visible, Golubski placed his hand on Williams' leg. Williams slapped it away. Golubski repeated that he could really help Williams' sons. Golubski's offer was obvious: her sons' case might benefit if she let Golubski have what he wanted. But Williams continued rejecting him.

166.    He placed his hand on her leg again, pushing it up under her skirt. Williams asked Golubski what he was doing as she stood up. Golubski grabbed Williams by the wrists, pinned her hands over her head, twisted her, pushing her down onto the couch while unzipping his pants with his other hand. While immobilizing Williams by holding her hands over her head, Golubski raped her. Struggling to get up, Williams declared "this is rape." Golubski responded, "you'll like it," and "it'll only take a minute." During the rape, Golubski kept repeating that he could help her sons. Williams tried fighting him off but was unsuccessful because Golubski was stronger. Williams was powerless.

167.    After he finished, Golubski went into Williams' kitchen and began wiping the bodily fluids off his penis with paper towels sitting on her table. Williams declared she was going to report him. Golubski responded, "Report me to who, the police? I am the police." When he left, Golubski took the paper towels with him. As he left, Golubski ominously told Williams, "I will see you later."

168.    And he did. Roughly a week or two later, Golubski returned to Williams' home and raped her again. And again. And again. This continued for the next several years, with Golubski showing up at Williams' home every week or two and demanding sexual favors. When Williams moved from her house to an apartment complex, Golubski hunted her down and raped her there, too. Figure 3 is the distance from Williams' home on Garfield where the search warrant was served to her new apartment on Ray Avenue:



(Figure 3). But Golubski still found her.

169.    When Golubski showed up at Williams' new apartment on Ray Avenue, he offered

that her sons were doing well. He then put his arms around her, touched and squeezed her butt,

and shoved her down onto her couch. Golubski pulled up Williams' skirt, forced Williams' own

hand to unzip his pants, and began raping her.

170.    Other times, Golubski would demand oral sex from Williams. Forcing his penis

into her mouth, Golubski would grab the back of her head, and push her head down on his penis

until Williams choked. When Williams protested, Golubski would remind her that he was going

to help her sons, that he would speak with the prosecuting attorney, and even, incredibly, "I can

be a good friend of yours."

171.    During two encounters, Golubski told Williams she needed to quickly perform oral

sex because his partner – Zeigler – was waiting in the patrol car. The first encounter when Golubski

mentioned Zeigler, Williams did not understand its importance. Later that week and when visiting her sons in jail, Williams learned that Zeigler was the KCKPD detective assigned to her sons' case.

172.     Golubski even hunted Williams outside of her home. Following her home from the store, Golubski pounded on her front door. When Williams opened it, Golubski demanded to know who was in the apartment. Knowing what was coming, Williams called her daughter from upstairs and instructed her to go across the street. When Golubski threw Williams down on the couch again and tried to insert his penis into her mouth, Williams kept her mouth closed, trying to stop it. When Golubski managed to pry her mouth open, Williams threatened to bite his penis. Golubski responded that if she did, he would shoot her. With his firearm still on his side, Williams believed the threat.

173.     Williams' apartment complex was known for significant drug activity. Because people routinely saw Golubski with Williams, Williams developed the false reputation of being a police snitch. Given its drug culture, this ostracized her from her community, isolated her, and ensured she had no one to talk to about Golubski's assaults. Other times, Golubski forced Williams into his police car and drove her around, parading her to the community. This further cemented her false reputation as a police snitch. On one drive, Golubski grabbed Williams' head, shoved it between his legs, and made her perform oral sex while he drove.

174.     For the next two to three years, Williams was raped multiple times, repeatedly forced to perform oral sex, and continually sexually assaulted.

175.     Throughout these rapes and sexual assaults, Golubski always wore his Unified Government-issued firearm and consistently reminded Williams that he could help her sons, that he knew people, and that he often drank with the Unified Government's prosecutor.

176.     Williams remained afraid that Golubski would shoot and kill her if she spoke out or told anyone about Golubski's conduct. Even after her sons were sent to prison, Williams remained afraid that Golubski knew people in prison and could have her sons hurt. This fear continues to today.

177.     At one point, Williams threatened Golubski that she would tell someone what he was doing. Golubski chillingly responded that if she did, he would have someone do something to her and she would never be found again. Based upon Golubski's reputation in the community, his conduct while raping and sexually assaulting her, and his control over her sons' safety, Williams reasonably believed these threats.

### Kill and Bye used their authority as police officers to abuse and sexually assault Richelle Miller

178.     Plaintiff Richelle Miller is another one of Defendants' victims.

179.     On June 4, 2002, Miller was awoken at 4:15 in the morning by a call from KCKPD. They told her that her father was dead and that she needed to immediately go to the morgue to identify the body. She was not told that she was being arrested, that she was a suspect in a criminal investigation, or that she was a material witness to the death.

180.     Miller arrived at the KCK morgue as instructed. She was led to a table, with a body covered in a white sheet. Kill and Bye were in the room watching. When the sheet was pulled back, Miller saw a corpse that was so badly burned that it was unidentifiable. Assuming that the corpse was her father both overwhelmed and traumatized Miller, who immediately broke down and began crying. Kill and Bye stood watching Miller, and did nothing to intervene or console her.

181.     Based on the condition of Miller's father's remains, no reasonable person could have expected Miller to be able to identify the body. Ultimately, dental records had to be used for a positive identification.

182.    The officers then told Miller that they needed to ask her a few questions, and transported Miller to the police station in a police car, where she arrived around 7:00 am.

183.    Kill and Bye explained to Miller that her father was killed sometime between 12:30 am and 4:00 am. They told her that he had been in his car in the abandoned Bell's Crossing, a known hangout of Golubski. The car had been set on fire and left on the railroad tracks, where it was run over by a train. The car then exploded. Miller again began sobbing.

184.    One of the officers left the room, and the other increased the intensity of the questioning. When the officer who initially left returned, the officer who had stayed then left. The new officer increased the intensity of questioning. This pattern of tag-teaming was repeated countless times over the next hours. Miller was confronted by a repeating cycle of questions from the two-officer tag-team:

Did she murder her father? *No.*

Did she know who did? *No.*

Was she in a sexual relationship with her father? *No.*

185.    Miller repeatedly told the officers that she wanted to go home and requested to leave, but Kill and Bye refused, stating that they were not done with her yet.

186.    Miller was never advised of her rights and was never given an opportunity to contact a lawyer, nor was Miller ever advised that she was a suspect in a criminal investigation.

187.    The room in which Kill and Bye questioned Miller was extremely cold. So cold in fact that she required a blanket. Miller repeatedly asked to leave and was repeatedly refused.

188.    Finally, late into the night, during a session when she was alone with Detective Kill, Kill walked around behind Miller, began rubbing her shoulders with his hands, bent down close to

her ear, and whispered, "If you get on this table, I can make it all go away." Kill then walked around to Miller's front and he gestured toward his penis while looking her in the eyes.

189.    Kill then offered, "I can turn off this camera, pull down my pants, and we can do what we need to do." He then motioned to the desk, tapped his hand on it, and said: "Get on the desk."

190.    Miller lost whatever control remained of her emotions and began sobbing uncontrollably. The image of her father's burnt corpse, the abusive nature and length of the interrogation, the lack of food, her isolation in the freezing room, the dominating posture of the two officers, and, finally, Kill's demand for sex paralyzed her. She did not answer, but just coiled up into a fetal position, making herself as small as possible, and sobbed until Kill finally left the room.

191.    Bye returned and repeated the same questions: Had she killed her father?; Did she know who killed him?; Did she have sex with her father? Miller went numb and cannot recall whether or not she continued answering.

192.    As suddenly as her phone rang at 4:15 am the day before, the interrogation stopped. Bye put her into a police car and drove her back to her car at the morgue. Miller noted the clock: 2:00 a.m.

193.    Miller was detained and interrogated for 19 straight hours.

**The Unified Government Caused Plaintiffs' Injuries**

194.    The constitutional violations against Plaintiffs were not anomalous or isolated acts of misconduct. They were intentional and/or resulted directly from the Unified Government's customs, policies, or practices, which fostered and enabled the conduct described in greater detail above.

195.    The similarity and pattern of the rapes, sexual assaults, and mistreatment of vulnerable Black women in KCK by the Unified Government's employees further evidences the Unified Government's customs, policies, or practices. In fact, so numerous and so notorious are the rapes by Unified Government employees in KCK, that Golubski alone has been indicted *twice*,[19] and a local newspaper reporter won a Pulitzer Prize for her coverage of corruption and rape in the Unified Government.[20] In a Motion for Detention, the Government alleged 7 additional victims, all with eerily similar allegations – *and the Government is still investigating more victims*.[21]

196.    The Unified Government, by and through its final policymakers, not only knew about this conduct, and its informal policies and customs enacted under the Police Chief Defendants' watch permitted this conduct by Unified Government employees.

197.    Despite its actual or constructive notice of these constitutional violations, the Unified Government refused and/or failed to make any meaningful investigation into the charges that its employees committed the misconduct described above.

198.    The Unified Government, by and through its final policymakers, also had actual or constructive notice that widespread and systematic failures to train, supervise, or discipline its employees for misconduct, including rape and sexual assault of citizens, had enabled its police officers to engage in misconduct without repercussion. The Unified Government's continued

---

[19] *USA v. Golubski*, Case No. 5:22-cr-40055-TC-RES (6 counts, including sexual assault, sexual abuse, and kidnapping) ("Golubski Criminal Rape Case"); *USA v. Brooks, et al.*, Case No. 5:22-cr-40086-TC-RES (2 counts, including sexual assault, sexual abuse, and kidnapping) ("Golubski Criminal Sex Trafficking Case").

[20] https://www.pulitzer.org/winners/melinda-henneberger-kansas-city-star.

[21] Golubski Criminal Rape Case, Government's Memorandum and Proffer in Support of its Motion for Pretrial Detention, Doc. 10.

adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of Plaintiffs and similar Black women.

### Informal policies, procedures, and customs created a widespread practice of police abusing government authority

199.   The Unified Government, by and through its final policymakers, at all times relevant to this Complaint and covering over a decade, maintained informal policies, procedures, and/or customs that permitted police (including Detective Defendants) to (i) kidnap, coerce, pressure, sexually assault, and rape Black women; (ii) utilize improper investigative practices to obtain wrongful convictions in order to support and further a government-sanctioned Protection Racket; and (iii) discourage, prevent, and fail to investigate complaints of police misconduct.

### *Kidnapping, coercing, pressuring, sexually assaulting, and raping Black women*

200.   Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of encouraging or knowingly permitting certain favored employees, including Detective Defendants, to kidnap, coerce, pressure, sexually assault, and rape Black women in violation of clearly established constitutional rights.[22]

201.   In addition to the factual allegations of Plaintiffs, as detailed above, there are other Black female victims of the Unified Government's employees whose experiences so closely mirror Plaintiffs' allegations that they evidence the Unified Government's informal policies, procedures, and customs, including:

a.   E.A. who first met Golubski in the early 1990s while he was investigating a murder at her workplace. He became obsessed with her, falsely accused her of being involved with a different murder (as a pretense to talk to her), and repeatedly called her at home, once

---

[22] *Graham v. Connor*, 490 U.S. 386 (1989); *Davis v. Passman*, 442 U.S. 228 (1979); *Long v. Laramie Cnty. Cmty. Coll. Dist.*, 840 F.2d 743 (10th Cir.), *cert. denied*, 488 U.S. 825 (1988).

pretending to be a rapist. Golubski stalked E.A. continually, until she agreed to marry him if he took care of her financially. She divorced him after learning about his sexual involvement with witnesses. Following the divorce, Golubski continued to stalk her for 10 years. When he later assaulted her in her car, in defiance of an order of protection, KCKPD refused to discipline Golubski.

      b.    Golubski had a regular relationship with D.L. and used her for sex and information. She knew, as most other women in KCK knew, that when Golubski came around, she either had to provide sexual services to Golubski or get arrested.

202.    Indeed, KCKPD officers openly joked about children that Golubski was reputed to have fathered with prostitutes. When one of Golubski's alleged daughters was arrested, the arresting officer placed a courtesy call to Golubski to notify him.

203.    Detective Defendants also used terror to reinforce the community's belief in their unlimited authority. Their regular acts of humiliation and exploitation included:

      a.    Entering residents' homes in low-income projects at will and threatening to arrest females' boyfriends if they did not have sex with Detective Defendants or provide information. Sometimes, even the woman's compliance was not enough to deter Detective Defendants from arresting the boyfriends of vulnerable women;

      b.    Following Black men around the community, harassing and threatening them, and stealing their money and drugs;

      c.    Fostering and encouraging the illegal drug trade and prostitution in KCK in order to skim money from known drug dealers, as represented by Detective Bye's common refrain that "a dead nigger doesn't make me money. But a live nigger on the street? That makes me money."

d.      Picking up Black women in police cars and openly driving around with them in the community, exposing them as informants and as victims of his sexual assaults;

e.      Engaging in acts of humiliation, including an incident recalled by affiant Gregory Wilson, who described how Golubski once conducted a search of a man's groin by forcing him to drop his pants and lift his testicles in front of a crowd of 20 or 30 people;

f.      Taking other officers to pick up prostitutes, and hunting for the younger women (those in their 20s and even younger) who were known to be Golubski's favorites and knew they had to comply with the officers' demands for sex or be arrested; and

g.      Acting out of personal animus and targeting particular individuals for retribution.

204.    The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned informal policies, practices, and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

*Improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket*

205.    Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of encouraging or knowingly permitting certain favored employees, including Detective Defendants, to utilize improper investigative practices to obtain wrongful convictions in order to support the government-sanctioned Protection Racket in violation of clearly established constitutional rights.[23]

---

[23] *United States v. Price*, 383 U.S. 787 (1966); *United States v. Brown*, 555 F.2d 407 (5th Cir. 1977); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.); *United States v. Gwaltney*, 790 F.2d 1378 (9th Cir. 1986), *cert. denied*, 479 U.S. 1104 (1987).

206.    Specifically, the Protection Racket, including Detective Defendants, regularly engaged in the improper and illegal acts described above in order to obtain unreliable and often falsified evidence to close cases and obtain wrongful convictions. Using force, threats, and illegal inducements, Detective Defendants developed a large network of poor, often drug-addicted Black women whom they used as "informants." Some women were homeless or worked as prostitutes, others were children as young as 13 years old. The rest simply had the misfortune of being Black in KCK.

207.    To operate their informant network, Detective Defendants and the Protection Racket used drugs and money (that they regularly stole from lower-level drug dealers or were given as payment from drug dealers receiving protection) to pay vulnerable, and often underage, Black women in exchange for sex and information. Detective Defendants' practice of providing drugs and money to addicted women was well-known to the Unified Government, including Police Chief Defendants. The Unified Government, including Police Chief Defendants, also knew that Detective Defendants drove in their police vehicles with these women and forced them to perform sex acts while Detective Defendants were on duty. In fact, Golubski regularly picked up his informants, including Black women he enslaved and trafficked, in his official police vehicle and drove them around KCK where he was seen by citizens and countless Unified Government officials. Golubski also openly had sex with Black women in his police vehicle and his office at police headquarters.

208.    In turn, criminals paid the Protection Racket to shield themselves from criminal investigation, arrest, and prosecution. To coverup this protected crime, Defendants wrongfully convicted countless Black men. Drug dealers in KCK sold drugs and protected their turf and business interests through violent acts, including assault, kidnapping, and murder. Although these

acts were well known and sometimes reported to KCKPD, the high-level dealers consistently avoided criminal sanction because the Protection Racket protected them from arrest and provided advance notice of investigations and raids.

209. Golubski was known to be especially close to Cecil Brooks, and they were often seen speaking together, either in Golubski's car, Brooks' office in the Delavan Apartments, or secluded areas. Although Cecil Brooks was known throughout the community as an open and notorious dealer of crack cocaine throughout the 1990s and early 2000s, he escaped any criminal consequences while operating in KCK. The Protection Racket enabled criminal organizations to operate large, lucrative drug enterprises, and to engage in violent acts to protect their interests, such as the murder of Newsom's son, Doniel Quinn.

210. Ruby Ellington, a retired officer who served in the vice unit, attested that although she and other officers repeatedly tried to bring charges against Brooks, he was "always clean" when they stopped him, indicating that KCKPD officers were warning Brooks about investigations. On November 10, 2022, the United States of America unsealed a grand jury indictment for Brooks' and Golubski's conspiracy.[24] In it, the Government confirmed that Golubski conspired with Brooks and others by providing protection from law enforcement investigation and intervention into the criminal offenses, including sex trafficking, at the Delavan Apartments.

211. The Unified Government, by and through its final policymakers, knowingly permitted this misconduct and allowed the use of improper investigative practices to close cases while expending little or no effort to try to determine whether the real perpetrators of crimes had

---

[24] Golubski Criminal Sex Trafficking Case, Doc. 1.

been investigated and convicted. Instead, the Unified Government rewarded this behavior, praising and promoting Detective Defendants, including Golubski and Zeigler.

212.    Indeed, the Unified Government, by and through its final policymakers, knew that if a conviction was needed, Detective Defendants and the Protection Racket would obtain it. The Unified Government accepted and permitted Detective Defendants to jealousy guard the identities of their "informants," including the identity of "Golubski's Girls," who the Unified Government knew Golubski controlled with violence, sexual assault, rape, and threats.

213.    The Unified Government, by and through its final policymakers, also knew that Detective Defendants traded their ability to "fix" criminal charges in exchange for sexual favors and information. These "trades" were encouraged and assisted by Detective Defendants' supervisors, including Police Chief Defendants.

214.    Despite the bulk of Detective Defendants' information coming from informants who had been coerced, bribed, and victimized, the Unified Government used this unreliable information to investigate criminal matters, close cases, protect notorious drug gangs, and falsely convict innocent citizens. Indeed, the exploitation of vulnerable Black women as an investigatory "tactic" was so widespread, open, and notorious that many people (including Unified Government employees, KCKPD detectives, officers, supervisors, and a Chief of Police) have attested under oath that they knew about the misconduct. Given its open and notorious nature, anyone familiar with KCKPD was aware of the issue. In fact, the conduct was so pervasive and known that the Kansas Legislature expressly criminalized it. The law, codified at K.S.A. 21-5512(a)(13), was

motivated in part by Golubski's known repeated threats to arrest Black women or their family, unless they agreed to have sex with him.[25]

215.    The improper investigative practices included, but were not limited to, (a) using misleading and improperly suggestive photo lineups; (b) obtaining identifications (including knowingly false identifications) through manipulative and coercive means; (c) feeding information to eyewitness or indicating whom they should identify; (d) manipulating or coercing witnesses into making false or fabricated statements; (e) failing to document or disclose exculpatory evidence; (f) failing to document witness statements and instead relying solely on an officer's claims about what the witness said; (g) failing to gather or analyze critical physical evidence; and (h) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices.

216.    Other Black female victims' experiences mirror those of Plaintiffs. For example, T.B. was the friend of a murder victim whom Golubski attempted to coerce into giving information related to the crime. T.B. knew nothing about a particular murder, but Golubski interrogated her anyway, frightening her with sexual advances. He later stalked her at home and work.

217.    Detective Defendants also repeatedly failed to disclose to criminal defendants that they had sexual contact with witnesses, or that the information they obtained from their "informants" was obtained through coercion via the practices described above.

218.    For example, Golubski and others committed multiple improper investigative practices in order to falsely convict LaMonte McIntyre.[26] This included coercing Quinn to perjure

---

[25] Vice News, *Kansas had to pass a law to tell cops they can't have sex with people they're arresting* (May 15, 2018, 1:08 PM), https://www.vice.com/en/article/435ded/kansas-had-to-pass-a-law-to-tell-cops-they-cant-have-sex-with-people-theyre-arresting; The Wichita Eagle, *New Law: Kansas Cops Can't Have Sex During Traffic Stops* (*updated* May 28, 2019, 12:51 PM), https://www.kansas.com/news/politics-government/article210902319.html.
[26] For a detailed discussion of this improper conduct, see *McIntyre, et al. v. Unified Government, et al.*, Case No. 2:18-cv-02545-KHV-KGG, Doc. 74.

herself when she knew that McIntyre did not murder her cousin. This served three purposes for Defendants. First, the Protection Racket was able to protect the real killer. Second, the conviction gave Golubski leverage over McIntyre's mother, Rose, whom Golubski was able to force to submit to his sexual perversions. Third, Golubski then used his role in the investigation as leverage to sexually assault and stalk Newsom and Quinn.

219.    Similarly, Golubski, Zeigler, and others committed multiple improper investigative practices in order to falsely convict Williams' sons, Ronell and Donell. KCKPD coerced false murder confessions from the 14-year-old twins, who were interrogated by police officers without the presence of a guardian or lawyer after offering a *quid pro quo* of releasing their 13-year-old brother in exchange for the confessions. This allowed the Protection Racket to protect the real killer and gave Golubski leverage to repeatedly rape and sexually assault Williams.

220.    Golubski's improper investigative practices included, for example, J.H, who served as one of "Golubski's Girls." Golubski forced J.H. to sexually pleasure him while making her provide him with information or to pass messages to organized criminals. Golubski would also drive J.H. to deserted areas where Black women had been found and would show her polaroid pictures of their disrobed, dead bodies while forcing J.H. to sexually pleasure him. Similarly, C.R. tried to avoid Golubski but ultimately was forced to have sex with him. Golubski provided C.R. with protection from arrest in return for frequent sexual favors. C.R. attested that "I did what I had to do to stay out of jail…I provided him with sexual favors in his vehicle." In another example, K.D. encountered Golubski while dealing drugs in the 1990s. Although Golubski typically shook down street-level dealers and took their drugs, he sometimes would purchase them. K.D. once sold crack cocaine to Golubski through an intermediary and then saw him enter a house to have sex

with the woman who received the drugs. Later, Golubski approached K.D. for sex, offering police protection; telling her that he had "pull" and could get rid of any tickets for her.

221.     It was well known within the Unified Government that Golubski frequented known drug dealers and their dealing locations. Golubski was frequently seen taking cash from these criminals. Nevertheless, the Unified Government never tried to stop this conduct or discipline Golubski or other Detective Defendants.

222.     The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices, and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

*Discouraging, preventing, and failing to investigate complaints of misconduct*

223.     Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of discouraging, preventing, and failing to investigate complaints of misconduct, thus nonfeasance, in violation of clearly established constitutional rights.[27]

224.     Citizens experienced the Unified Government's policies, procedures, and customs, including:

a.     Quinn filed a complaint to Internal Affairs when her arm was dislocated by a KCKPD police officer. In response, Golubski tracked down Quinn, ordered her to a secluded park, and threatened that if she did not withdraw her Internal Affairs complaint, the Unified

---

[27] *Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982); *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972); *Webb v. Hiykel*, 713 F.2d 405 (8th Cir. 1983); *Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986).

Government would allow the man who murdered her sister to walk free. Then Golubski sexually assaulted Quinn with a baton.

        b.      Omitting Golubski's name, Williams, mentioned police abuse to Sonny Cunningham, a KCKPD detective. Despite Cunningham being a family friend, Williams was still fearful of Golubski and his power and therefore consciously avoided using Golubski's name and instead spoke in generalities. Cunningham grew quiet, which Williams understood meant that Cunningham instantly knew the perpetrator was Golubski. Cunningham asked Williams if she had revealed it to anyone else. When Williams said no, Cunningham asked if Williams had filed a complaint. Williams said no and that she did not know how to file a complaint. Based on Cunningham's physical demeanor and responses, Williams understood she should drop the topic and never mention it again. As a result, Williams never raised the issue with another police officer again. Nor did Cunningham ever approach the topic with Williams.

        c.      Rose McIntyre went to KCKPD Internal Affairs to complain about Golubski forcing her to submit to a sexual act, but she was refused the opportunity to even file a complaint. The Internal Affairs investigator told her "our officers don't do things like that." Ms. McIntyre was upset by the officer's statement, because she knew it was false and also knew that at least one witness had seen her with Golubski. At police headquarters, when a police officer opened Golubski's office door and walked in on Golubski sexually assaulting Ms. McIntyre, the officer did not intervene; he simply backed out and shut the door.

        d.      In the 2000s, another woman was with Golubski in his office when a detective walked in on and found Golubski with his fly unzipped and his groin not far from the woman's face. KCKPD supervisors learned of the incident but did nothing.

e.      Golubski stopped N.H. under the guise that she looked like an aggravated battery suspect. He began paying her for sex and information on a regular basis. Golubski introduced N.H. to other KCKPD officers, who also paid her for sex. When an officer raped her at gunpoint after an arrest, she complained to KCKPD, but to her knowledge, the officer was never disciplined.

225.    Similarly, KCKPD employees have described the Unified Government's policies, procedures, and customs:

a.      One KCKPD detective received a phone call from one of his informants, who told him in an upset tone that he had just seen Golubski buying sexual services from prostitutes. Nevertheless, no complaint was made, nor any investigation opened.

b.      Officers often witnessed Golubski leaving decrepit motels and low-income housing projects, where he was known to obtain sexual services from "informants" and other exploited women. On one notable occasion, Golubski was spotted off duty, under suspicious circumstances. When a nearby patrol officer, acting under orders from his supervisor, pursued him, Golubski fled in his vehicle.

226.    By openly and notoriously committing the misconduct described above, Detective Defendants' terrorization of the Black community perpetuated the perception that Detective Defendants and the Unified Government could rape, steal, and murder without risk of exposure or prosecution. This aided Defendants' efforts to discourage complaints, and also ensured Plaintiffs were too fearful to come forward with their allegations of abuse.

227.    Despite these and other complaints, and the open and notorious nature of Detective Defendants' misconduct, relevant Internal Affairs records are minimal. The few complaints that were logged were deemed unsubstantiated, most often because the complainant was deemed "not

credible." Upon information and belief, this was a euphemism for "Black complainant." None of the many officers who witnessed or otherwise became aware of Detective Defendants' sexual activities and their exploitation of drug-addicted and unreliable informants submitted an internal complaint to Internal Affairs, and there is no record that any supervisor or Police Chief Defendant attempted to deter Detective Defendants' sexual exploitation and misconduct.

228.     Although the Unified Government, including Internal Affairs and Police Chief Defendants, learned that Detective Defendants committed the misconduct described above, including raping and sexually assaulting citizens (even in police headquarters), it never stopped them, disciplined them, or even opened an investigation.

229.     The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices, and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

**Failure to adequately train and supervise its employees permitted the conduct**

230.     The Unified Government, by and through its final policymakers, at all times relevant to this Complaint and covering decades, failed to adequately train and supervise its employees. As a direct result, Unified Government employees, including Detective Defendants, were permitted to commit the unlawful acts described above.

231.     The similar pattern of constitutional violations against Plaintiffs and other Black women in KCK put the Unified Government on notice that its employees, including KCKPD and Detective Defendants, needed training. Despite this, the Unified Government failed to provide any training or supervision in an effort to stop this misconduct. This constitutes deliberate indifference

to the known previous and risk of future constitutional harms that its lack of training posed to citizens in KCK.

232.    The Unified Government failed to implement adequate training, guidelines, and supervision to: (1) deter sexual activity between officers and witnesses or informants; (2) ensure the physical and emotional safety of informants and protect them from exploitation; (3) protect the integrity, legitimacy, and accuracy of investigations, prosecutions, and convictions; (4) prevent the use of physically, mentally, or sexually exploited Black women as involuntarily informants and sex workers and the collection of unreliable and falsified "information"; and (5) ensure employees reported and disciplined misconduct by KCKPD  and Detective Defendants. The lack of adequate and appropriate supervision of KCKPD and Detective Defendants, and the failure to discipline and train them to report the misconduct of their colleagues, demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not commit.

233.    The Unified Government, including Police Chief Defendants, knowingly permitted Detective Defendants to violate the constitutional rights of citizens with impunity. With little or no check on their conduct, Detective Defendants used the power of their badge and office to satisfy personal vendettas, protect favored individuals (including high-level drug dealers), and frame and falsely convict innocent people for the crimes of others. No supervisor and no Police Chief Defendant acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter Detective Defendants from their constant and egregious violations of citizens' constitutional rights, or to require other employees to report misconduct.

234.    The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices, and/or customs, in spite of their known and

obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

**KCKPD officers openly admit the existence of the Unified Government's policies and procedures**

235.    KCKPD police officers have attested to the existence of the Unified Government's policies, procedures, and customs. Four such examples are Max Seifert, Ruby Ellington, Michael Kobe, and Jackie Green.

236.    Seifert, a retired KCKPD detective, sued the Unified Government after he was retaliated against for speaking out about KCKPD misconduct.[28] Seifert explained that within the KCKPD culture, homicide detectives were treated as "sacred cows."[29] After a detective walked in on Golubski receiving oral sex from a Black female *inside KCKPD headquarters*, the Unified Government's response, communicated by KCKPD's then Chief of Police, was to call a meeting and simply ask, "Don't you guys have locks on your doors?" As Seifert stated: "It's like gravity. Corruption doesn't start from the bottom and go up. It starts from the top and comes down. That's corrupt…And when the guys in the ranks, the lower ranks, see the commanders doing whatever they want to do, and it's not right, then they think, 'Well, hey, why not?'"[30]

237.    Ellington, the first Black officer in KCKPD[31] agreed. In a sworn affidavit, Ellington stated that over decades:

---

[28] *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141 (10th Cir. 2015).
[29] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.
[30] *Id.*
[31] *Id.*

a.      Golubski had a reputation for being obsessed with Black female prostitutes who were typically drug-addicted, poor, and powerless,[32] and "Golubski's misconduct and his exploitation of [B]lack women was well known throughout the Department. Despite this, he was never punished. In fact, he rose steadily through the ranks and became a powerful detective and, ultimately, a captain."[33]

b.      "Golubski had a reputation in the Department and the community for taking care of warrants and tickets for [B]lack prostitutes if they provided sexual favors. If a [B]lack female had any kind of criminal charge or other legal problem, Golubski would use that as leverage to get what he wanted."[34] "Everyone in the Department knew that when Golubski would go out on calls, that any [B]lack female involved would likely end up in his police car with him."[35]

c.      "Golubski made no secret of his activities. In fact, it was well known in the Department and the community that he would get sexual favors from prostitutes in his police vehicle while he was on duty."[36]

d.      "It was also widely known that Golubski was so involved with [B]lack female prostitutes and drug addicts that he fathered children with some of them…Roger Golubski's involvement with them was no secret, and no one seemed shocked that he had children with some of these women. It was simply accepted as part of what Roger Golubski was able to do without repercussion."[37]

---

[32] *McIntyre, et al. v. Unified Government, et al*, Case No. 2:18-cv-02545-KHV-KGG, Memorandum of Law in Opposition to Defendant Golubski's Motion for Summary Judgment, Exhibit 81, Affidavit of Ruby Ellington at ¶ 6, Doc. 605-53.
[33] *Id.*
[34] *Id.* at ¶ 8.
[35] *Id.* at ¶ 7.
[36] *Id.* at ¶ 10.
[37] *Id.* at ¶ 15.

e.  "Golubski does not attempt to hide these relationships or to conceal the fact that he is often in the housing projects for his own personal reasons, rather than law enforcement purposes. In fact, during meetings of the Black Police Officers Association, which were held in a meeting room at Gateway [housing project], the officers in the association would sometimes see Golubski driving through the project."[38]

238.    Ellington also attested to the Unified Government's role in preventing reports and failing to disciple Golubski, despite knowledge of his conduct. "Although some officers were disturbed about Golubski's misconduct, they were afraid to speak up. They knew that Golubski's activities with prostitutes were well known throughout the Department, but his misconduct was never acknowledged or punished."[39] "Golubski was part of the 'in' group at the Department, and he never seemed to suffer any repercussions for his activities. Even if an officer had been willing to speak up and complain about Golubski, that officer knew that it would have done no good. Golubski was perceived as untouchable."[40]

239.    Kobe, a retired KCKPD captain, reported Golubski's misconduct to his then-supervisor, Major Gary Wohlforth, but KCKPD did nothing to address the issue. Kobe, who was also Golubski's supervisor at one point, intentionally failed to document his concerns in writing because he believed, based on his experience with the Unified Government, that complaints about Golubski's misconduct were not taken seriously by those higher in the chain of command.

240.    Green, a former KCKPD crime scene investigator ("CSI"), was the only Black woman in her KCKPD Police Academy class. Green's experiences further evidence the Unified Government's knowledge of Defendants' conduct and their policy to enable this unlawful conduct:

---

[38] *Id.* at ¶ 17.
[39] *Id.* at ¶ 18.
[40] *Id.* at ¶ 18.

a. After graduating and being on the streets for 2-3 years as a patrol officer, citizens started approaching Green and alleging physical and emotional abuse, threats, and theft by KCKPD officers. Green would listen to these reports and encourage the citizens to contact KCKPD Internal Affairs. Some of these civilians agreed to do so. But a far greater percentage either stated that they feared retaliation from KCKPD for reporting misconduct to Internal Affairs, or they had previously complained to Internal Affairs and were either refused the ability to make a report or the misconduct continued.

b. Early in her career, Green made a complaint to her sergeant about two officers' misconduct toward a civilian. Green was discouraged from making the report, but nevertheless refused to withdraw it. Several days later, Green was dispatched to a domestic disturbance call. Due to safety concerns in such a scenario, Unified Government policy required backup to be dispatched too, which Green heard requested over the radio. But at the scene, Green's backup never arrived. Green was forced to handle the domestic disturbance alone and without any backup. After the call, Green discovered her backup sitting in his car several blocks away. Green understood KCKPD's message: if you report officer misconduct, you will be left exposed without adequate backup and abandoned in unsafe and dangerous conditions.

c. While working as a patrol officer, Green would frequently stop Black women suspected of carrying drugs or working as prostitutes. These women would pull out their cell phones and make a call. Soon thereafter and unrequested by Green, Golubski would arrive on the scene and either demand that Green let the woman go or take the woman into Golubski's custody and leave. Because Golubski was a detective and Green a patrol officer, KCKPD and its hierarchy required Green to cede to Golubski's authority.

d.      It was common knowledge within KCKPD and the Unified Government that the most corrupt non-detective police officers desired to work in the 7:00 p.m. – 3:00 a.m. "Umbrella Shift." These police officers wore all black uniforms during the dead of night. Green was once approached by a Black male with visible bruises on his face. He explained that he was beaten by KCKPD's "Umbrella Shift" north of 18th Street past the cemetery and near the railroad tracks. After listening to his story, Green told the man to contact and file a report with Internal Affairs. The man replied that Internal Affairs would not do anything, because he had already gone to them before and nothing was done in response. It was unclear to Green whether the man's most recent beating was retaliation for filing a complaint with Internal Affairs.

e.      While working the CSI night shift – 11:00 p.m. to 7:00 a.m. – Black women would frequently come to the back loading dock door and ring a bell to be let in. When Green would answer the door, the women would ask for Golubski by name. Many of these Black women appeared to be vulnerable and/or drug addicts. But Green never had to retrieve Golubski. Typically, either Golubski or Zeigler would meet the Black women at the back door and lead them upstairs to the detective offices.

f.      It was common knowledge within KCKPD and the Unified Government that police officers used apartments within government-subsidized housing (*a/k/a* "the projects") to have sex with vulnerable and trafficked Black women.

g.      It was common knowledge within KCKPD and the Unified Government that Golubski routinely took his detective car across state lines from KCK to Kansas City, Missouri. Termed "going across the water," traveling across state lines and into other police jurisdictions (outside of a police pursuit) with a police car required preauthorization from the Chief

of Police and the foreign jurisdiction's police chief. Despite this requirement, Golubski frequently would "go across the water" to collect Black women in Missouri and transport them back to KCK.

241.    Even the Unified Government's District Attorney readily admits the historic and widespread abuse of KCKPD on Black citizens. The Unified Government "recognizes that many individuals in the Wyandotte County community may have experienced serious issues with law enforcement from years and decades ago. These issues will not be ignored. It is important for our citizens to be heard, listened to, and served as best as possible."[41] "It was clear: if there was one [McIntyre], there's more."[42] But the Unified Government continues to fail to seriously investigate the systemic racism and police abuse.[43]

### Decisions by Chiefs of Police encouraged further abuse, including ratifying unconstitutional conduct and fostering a culture of abuse

242.    Despite knowledge of the foregoing, the Unified Government and Police Chief Defendants continued to reward and promote, rather than discipline, Detective Defendants and ratified unconstitutional conduct which fostered a culture of abuse.

243.    For example, despite knowledge that his informants were not only sexually exploited but also (in some cases) drug-addicted and unreliable, Golubski was put in charge of increasingly serious cases, rising to be head of the "major cases." At the time of his "retirement," Golubski had risen to the rank of Captain.

---

[41] Wyandotte County District Attorney, Mark Dupree, Community Integrity Unit Citizen Complaint Process and Standards, *available at* https://www.wycokck.org/Government/Courts/District-Attorney/Community-Integrity-Unit.

[42] Kansas City Star, *Wyandotte County District Attorney discusses the birth of the Community Integrity Unit* (September 24, 2022, 6:22 PM), https://www.kansascity.com/news/local/crime/article266068786.html.

[43] The Kansas City Star, *Lawyer hired to lead WyCo DA's integrity unit has already left, and no wonder* (June 21, 2023, 4:36 PM), https://www.kansascity.com/opinion/opn-columns-blogs/melinda-henneberger/article276560636.html.

244.    Similarly, despite his relationship with Golubski and his own improper conduct, Zeigler continued to rise and receive promotions, ultimately becoming the Chief of Police. This status permitted Zeigler to continue the Police Chief Defendants' efforts to aid the Protection Racket and shield it from liability.

245.    Seifert recounts that when a detective walked in on Golubski receiving oral sex inside KCKPD headquarters, the then-Chief of Police ratified the unconstitutional conduct by simply asking "Don't you guys have locks on your doors?"[44]

246.    The Unified Government also ratified other unconstitutional conduct by permitting it to occur openly and brazenly for decades without any repercussions. As a result, the community viewed Defendants as both enormously powerful and able to indiscriminately commit crimes against them.

247.    The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices, and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

## DAMAGES

248.    As a direct result of the aforementioned program of terror and conspiracies with drug cartels (occurring for decades and inflicted through Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions), Plaintiffs sustained injuries and damages which continue to date and will continue into the future, including: physical pain and suffering; severe mental anguish; emotional distress; destruction of family relationships;

---

[44] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.

destruction of community; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; and permanent loss of natural psychological development, for which Plaintiffs are entitled to monetary relief.

249. Additionally, the emotional pain and suffering caused by Defendants has been substantial. Since their assaults, Plaintiffs were stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right, including the fundamental freedom to live one's life as an autonomous human being without fear that the police will rape, sexually assault, and/or kill one.

### DEFENDANTS INTERFERED WITH QUINN'S, NEWSOM'S, AND WILLIAMS' CARE, CUSTODY, AND CONTROL OF THEIR CHILDREN, A FUNDAMENTAL LIBERTY INTEREST PROTECTED BY THE UNITED STATES CONSTITUTION AND THE KANSAS CONSTITUTION

250. The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Amendment's Due Process Clause "guarantees more than fair process," and includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests."[45] "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court."[46] Similarly, the Kansas Constitution requires that mothers are provided "for their equal rights in the possession of their children."[47]

---

[45] *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).
[46] *Troxel v. Granville*, 530 U.S. 57, 65 (2000).
[47] Kan. Const. Art. XI, § 6; *Matter of Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018).

251.    Quinn assumed parental responsibilities over her children and therefore possessed a fundamental right to raise her children and benefit from their society. In furtherance of the illegal scheme and agreement between Defendants' Protection Racket and organized criminals that Defendants would cover-up gang murders by framing innocent people, Quinn's parental responsibilities over her children were threatened. Thus, Defendants violated Quinn's fundamental right without due process of law.

252.    Newsom assumed parental responsibilities over her son and therefore possessed a fundamental right to raise her child and benefit from his society. In furtherance of the illegal scheme and agreement between Defendants' Protection Racket and organized criminals that Defendants would cover-up gang murders by framing innocent people, Newsom's son Doniel was murdered. Thus, Defendants took Newsom's fundamental right without due process of law.

253.    Williams assumed parental responsibilities over her children and therefore possessed a fundamental right to raise her children and benefit from their society. In furtherance of the illegal scheme and agreement between Defendants' Protection Racket and organized criminals that Defendants would cover-up gang murders by framing innocent people, Williams' sons Ronell and Donell have been falsely convicted and wrongfully imprisoned for a crime they did not commit. Thus, Defendants took Williams' fundamental right without due process of law.

### DEFENDANTS' CONDUCT HAS TOLLED ANY APPLICABLE STATUTES OF LIMITATION

254.    The laws of the United States are suitable to carry into effect the Plaintiffs' protection of their civil rights and for their vindication.

255.    Nevertheless, "[t]o decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has…frequently been employed to bar inequitable reliance on statutes of limitations."[48]

256.    Defendants used systematic illegal violence to provoke a state of terror, with the intention of achieving control over the Black community in KCK generally and Plaintiffs, specifically, by destroying their will to resist.

257.    Defendants, who knew their conduct was unlawful and tortious, and had a duty to protect and serve, concealed the existence of Plaintiffs' claims, affirmatively induced Plaintiffs to delay bringing their claims, and actively prevented Plaintiffs from asserting their claims through their acts, representations, admissions, and silence when it was their duty to speak, including:

      a.    Misrepresenting that Defendants were entering Plaintiffs' homes for official police business, including criminal investigations;

      b.    Misrepresenting an ability to influence criminal matters important to and involving Plaintiffs if Plaintiffs did not tell anyone or otherwise publicize Defendants' conduct;

      c.    Making explicit and graphic threats of violence if Plaintiffs told anyone or otherwise publicized the unwanted sexual advances and/or sexual assaults, including rapes;

      d.    Parading Plaintiffs around and ensuring Plaintiffs were seen with Defendants by community members so that Plaintiffs were socially ostracized and expelled from their community and social groups as "rats" or "snitches";

---

[48] *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33 (1959).

e.      Wearing police badges and firearms to reaffirm that Plaintiffs remained in danger and under the eye of government officials should they tell anyone or otherwise publicize Defendants' conduct;

f.      Stalking Plaintiffs so that Defendants could randomly appear in unexpected places, and touting that Defendants were powerful state actors with powerful friends, both in order to reinforce Defendants' omnipotence and their watching of Plaintiffs;

g.      Forcing Plaintiffs to enter Defendants' police cars to reaffirm Defendants' control over Plaintiffs;

h.      Repeatedly telling Plaintiffs, while raping and sexually assaulting them, that no one would believe Plaintiffs over the word of a police officer;

i.      Researching Plaintiffs' family and homes to make threats on Plaintiffs' family and appear at Plaintiffs' new homes after they moved in order to reaffirm that Defendants knew everything about Plaintiffs, Plaintiffs could not hide from Defendants, and neither Plaintiffs nor their family would ever be safe if they told anyone or otherwise publicized Defendants' conduct;

j.      Threatening victims that if they told anyone about the rapes and sexual assaults, something violent would be done to them, and their bodies would never be found;

k.      Threatening to shoot victims if they resisted Defendants' sexual assaults and rapes;

l.      Threatening to allow family members' murderers to walk free if Plaintiffs did not withdraw Internal Affairs complaints about KCKPD officers;

m.      Threatening to "put a case" on victims' family members if they told anyone or otherwise publicized Defendants' conduct; and

n.     Threatening to take away victims' children and jail victims if they did not comply with Defendants' demands.

258.   Despite a desire to diligently pursue their claims, Plaintiffs were prevented by Defendants' conduct.

259.   Plaintiffs acted in reliance upon Defendants' representations and conduct in that they reasonably believed that if they pursued their claims, they and their family would be harmed, killed, or set up for a criminal matter for which they were innocent, or that Defendants would interfere with Plaintiffs' and their families' criminal matters.

260.   Plaintiffs' reliance on Defendants' conduct and statements was reasonable, and as a direct result of each, Plaintiffs did not pursue their claims or otherwise publicize Defendants' conduct. This detrimental reliance and the duress exerted by Defendants meant that Plaintiffs kept quiet about Defendants' conduct for decades – even as news reports began surfacing. Indeed, particularly because after years of rumor, public discussion, even intensive news reporting, nothing happened and Detective Defendants remained open, notorious, and free, Plaintiffs believed Defendants were above the law and remained positioned to retaliate against them or their families if Plaintiffs did come forward with the truth of Defendants' conduct.

261.   It was not until September 15, 2022, when the FBI arrested Golubski and criminal charges were brought that Plaintiffs believed it was safe *enough* for them to finally come forward and seek the assistance of counsel to assert these claims.

262.     However, on September 19, 2022 – just 4 days later – Golubski was released again, after a judicial finding that the prosecutor failed to meet his burden to keep Golubski detained pending trial.[49]

263.     Defendants made their representations and threats in order to discourage and prevent Plaintiffs from bringing claims against Defendants.

264.     Defendants further concealed their conduct by affirmative act(s) that were designed and/or planned to prevent inquiry, escape investigation, and prevent subsequent discovery of Defendants' conduct in that they:

       a.     Ensured their Unified Government-issued firearm and police badge were visible to Plaintiffs before, during, and after their rapes and/or sexual assaults of Plaintiffs;

       b.     Wore business casual clothing and a suit jacket or blazer to identify themselves as someone with more authority than ordinary uniformed police officers;

       c.     Ensured they were seen with powerful criminal gangs so that Plaintiffs knew Defendants also had the backing of and were part of criminal conspiracies that operated unchecked and unrestrained and supported and protected by the Unified Government;

       d.     Offered prostitutes and other victims up to other police officers to buy their silence and implicate them in their unlawful conduct; and

       e.     Ensured they were visibly seen with victims in order to assert dominance and immunity.

265.     The Unified Government and Police Chief Defendants took affirmative steps to further conceal their and Detective Defendants' misconduct by, including, but not limited to,

---

[49] The Kansas City Star, *Judge releases ex-KCK detective Roger Golubski from detention, citing health concerns* (updated November 1, 2022, 11:59 AM), https://www.kansascity.com/news/local/crime/article265946441.html.

suppressing complaints made by victims by flatly refusing to accept their complaints, imposing onerous reporting requirements on them, disclosing Internal Affairs reports to KCKPD employees so that victims could be coerced to withdraw their complaints, and fostering a culture wherein other officers were intimidated and discouraged from reporting Detective Defendants' conduct or otherwise did not take those complaints seriously.

266.    The Unified Government and Police Chief Defendants also misrepresented that Detective Defendants' conduct was proper, including, without limitations, by refusing to discipline Detective Defendants; promoting and furthering Detective Defendants' careers; deeming complaints about Detective Defendants "not credible"; and knowingly allowing Detective Defendants to continue to terrorize KCK's Black women when they knew of the pervasive, unlawful, abusive, and racist conduct.

267.    Defendants' conduct stood in the way and prevented Plaintiffs from timely filing their claims because Plaintiffs were fearful for their lives, the lives of their families, and of Defendants' falsely convicting each for crimes they did not commit as retribution for speaking out.

268.    Because Plaintiffs "were trapped in a fog of misapprehension of their true rights,"[50] Defendants' actions and inactions and the duress they exerted over Plaintiffs means Defendants are equitably estopped from asserting a statute of limitation defense, and the statutes of limitation for Plaintiffs is tolled.

269.    As part of Defendants' wrongful attempt to conceal their propensity to sexually abuse Black women and their past sexual abuse from public scrutiny and criminal investigation, Defendants implemented various measures with the intent and effect of making Defendants'

---

[50] *Bistline v. Parker*, 918 F.3d 849, 883 (10th Cir. 2019).

conduct harder to detect and ensured that other victims with whom they came into conduct, including Plaintiffs, would be sexually abused and assaulted, including:

a.      Permitting Detective Defendants to remain in a position of authority and trust after the Unified Government and Police Chief Defendants knew or were deliberately indifferent to Detective Defendants raping and sexually assaulting their victims;

b.      Promoting Detective Defendants into higher positions with more serious criminal investigations, including putting Golubski in charge of "major crimes" and installing Zeigler as Chief of Police;

c.      Placing Detective Defendants without a workplace monitor and granting them unfettered access to and control over the individuals, victims, and "informants," thereby allowing Detective Defendants to physically and sexually interact with poor Black women, including Plaintiffs;

d.      Holding out Detective Defendants to Plaintiffs, other Black women, Wyandotte County citizens, and the public at large as trustworthy people of good moral character who were capable and worthy of being granted unsupervised access to Black women with a Unified Government-issued firearm and police badge;

e.      Failing to disclose and actively concealing Detective Defendants' prior record of misconduct, sexual abuse, harassment, and rape, and their propensity to commit such acts towards at-risk Black women, from constituents, the public at large, and other law enforcement;

f.      Failing to investigate or otherwise confirm or deny such facts about Detective Defendants, including prior complaints, claims, and investigations relating to sexual abuse Detective Defendants committed;

g. Failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Detective Defendants, such as by avoiding placement of Detective Defendants in functions or environments in which they would necessarily have intimate contact with females; and

h. Failing to implement systems or procedures to supervise or monitor officers to ensure that they did not rape or sexually assault citizens in Detective Defendants' care or charge, and report all reasonable suspicions of sexual assault or battery to law enforcement.

270. At all times pertinent to this action, Detective Defendants were agents, apparent agents, servants, and employees of the Unified Government and operated within the scope of their employment and their negligence is imputed to the Unified Government.

271. Defendants engaged in, joined in, and conspired with each of the other Defendants and wrongdoers in carrying out the tortious and unlawful activities herein described. Each Defendant is legally responsible for the occurrences herein alleged, and Plaintiffs' damages, as herein alleged, were proximately caused by all Defendants.

272. The terroristic violence created, cultivated, and fostered by Defendants was felt throughout KCK for decades. Systemic corruption crippled KCK, where children are told "Beware of Golubski." "They don't trust the police, and there's a lot of people who came forward to say 'hey, this is going on in our community.' And nothing was done about it."[51] In fact, even Cecil Brooks is afraid to talk about Golubski, knowing his connections, even today, throughout KCK: "I gotta get out of [prison] someday. I'm not messing with [Golubski]."[52]

---

[51] The Kansas City Star, *Ex-KCK cop Golubski had ties to criminals, prosecutors say. Was he their 'protector'?*, The Kansas City Star (November 2, 2022, 5:00 AM), https://www.kansascity.com/news/local/crime/article267104436.html#storylink=cpy.
[52] *Id.*

273.    These threats have not lessened over time. On the morning of January 19, 2023, Quinn discovered that her car was broken into in Missouri. Letters and papers were rifled through, but, critically, nothing of value was touched (including money). That night, Quinn received a death threat on her Facebook account. The sender was "Charlotte Howell," a name unknown to Quinn. After blocking the message, Quinn received the same death threat again, this time from "Kristina Forhad," also a name unknown to Quinn.

274.    Similarly, on January 20, 2023, Newsom awoke to find an infrequently used back door broken into and left standing wide open. Newsom possesses the only key to the door and confirmed it was bolted shut before going to bed the night before. Nevertheless, the door was pried open during the break-in, which broke the door's lock. Nothing was visibly moved in her home. In 30 years before Golubski's arrest, Newsom's home had never had a break-in or attempted break-in.

275.    Quinn's and Newsom's identities as witnesses and claimants were known to Defendants, including Golubski, prior to these events. For example, on January 11, 2023, Golubski's criminal counsel asked for the identities of the undersigned's clients. On January 30, 2023, Golubski's criminal counsel confirmed in writing that the Government had already provided a report in discovery that identified Quinn, Williams, Houcks, and Newsom as being represented by the undersigned.

276.    Plaintiffs believe these coordinated break-ins and confrontations were intended to emphasize that they are being watched by Defendants and warn them to stop their pursuit of justice for the wrongs committed against them and other victims. And the threats are working. Quinn immediately fled town and moved to another State. Newsom refused to report the break-in to

KCKPD, fearful of their access to her home, her person, and knowledge that their threats are working. But Quinn and Newsom both now sleep with weapons to protect themselves.

### THE CIVIL RIGHTS ACT OF 1871 BARS ANY STATUTE OF LIMITATIONS

277.   The Civil Rights Act of 1871 was the country's first civil rights law. It was instigated by President Grant's dire message to Congress on March 23, 1871 that the Ku Klux Klan through Jim Crow's precursor, "Black Codes," was depriving citizens of their constitutional rights, privileges, and immunities.[53]

278.   During debates on the law, Representative David Perley Lowe of Kansas underscored Congressional motivation:

> While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress.[54]

279.   As a result, the Reconstruction Congress passed the following language:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding*, be liable to the party injured in any action at law, suit in equity, or other proper proceedings for redress….[55]

280.   This italicized portion has been described as the "Notwithstanding Clause."[56] Thus, "[r]ights-violating state actors are liable – period – *notwithstanding* any state law to the contrary."[57]

---

[53] *Monroe v. Pape*, 365 U.S. 167, 172-73 (1961).

[54] *Monroe*, 365 U.S. at 175.

[55] Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added); *Wilson v. Garcia*, 471 U.S. 261, 262 n.1 (1985).

[56] Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023).

[57] *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring).

281.    "Then things went off the rails, quickly and stealthily. For reasons lost to history, the critical 'Notwithstanding Clause' was inexplicably omitted from the first compilation of federal law in 1874. The Reviser of Federal Statutes made an unauthorized alteration to Congress' language. And that error was compounded when the various revised statutes were later published in the first United States Code in 1926. The Reviser's error, whether one of omission or commission, has never been corrected. Today, 152 years after Congress enlisted the federal courts to secure Americans' constitutional rights, if one were to Google '42 U.S.C. § 1983,' the altered version that pops up says nothing about common-law defenses."[58]

282.    Until recently, courts have never even considered grappling with the Notwithstanding Clause's significance.[59]

283.    Since the enactment of the United States Constitution, federal law preempts state law, and state law that conflicts with federal law is without effect.[60] And although there is a presumption that state law is not superseded by federal law, such presumption is overcome by "clear and manifest purpose of Congress."[61] One method of establishing such intent is by Congress expressly stating the intent to preempt within the statute.[62]

284.    By expressly preempting any state law that purports to limit Section 1983, Congress has rendered state statutes of limitations without effect in Section 1983 claims. As a result, "[i]t is not for this court to revise it by beating a new path around preemption nowhere authorized in the

---

[58] *Rogers*, 63 F.4th at 980 (Willett, J., concurring).
[59] *Rogers*, 63 F.4th at 980 (Willett, J., concurring).
[60] U.S. CONST., art. VI, cl. 2; *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) ("In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it"); *McCulloch v. Maryland*, 17 U.S. 316 (1819).
[61] *Cipollone v. Liggett Group, Inc.*, 505 U.S. 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).
[62] *Jones v. Rath Packing Co.*, 430 U.S. 519 (1977); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983).

text of the statute and nowhere recognized in any of the Supreme Court's many forays into this field."[63]

285.     Years later in *Monell*, the Supreme Court of the United States held that municipal entities, like the Unified Government, may be sued under the Civil Rights Act of 1871 when their policies, customs, or practices cause the constitutional injury at issue.[64]

<u>**CLAIMS FOR RELIEF**</u>

286.     Each Defendant benefitted financially and/or received something of value from the misconduct detailed above. As a result, Defendants are liable for the following causes of action:

<u>**Counts of Michelle Houcks**</u>

**COUNT 1**
**Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983**
**(AGAINST GOLUBSKI)**

287.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

288.     Houcks is authorized to bring this civil claim against Golubski pursuant to the civil remedies provision of 42 U.S.C. § 1983.

289.     Golubski, acting individually and within the scope of his employment with the Unified Government, deprived Houcks of fundamental liberties without due process of law.

290.     Houcks, pursuant to the Thirteenth Amendment, has a fundamental liberty interest in not being subjected to slavery and involuntary servitude.[65] This interest is implied to Golubski

---

[63] *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1347 (10th Cir. 2015) (opinion of Gorsuch, J.).
[64] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, Syl. ¶ 2 (1978).
[65] *Jobson v. Henne*, 355 F.2d 129, 132 (2d Cir. 1966) ("As we cannot say that any such work program would not go beyond the bounds permitted by the Thirteenth Amendment, the complaint states a claim under § 1983"); *Smith v. Kentucky*, 36 F.4th 671, 675 (6th Cir. 2022), *cert. denied*, No. 22-91, 2022 WL 4654566 (U.S. Oct. 3, 2022); *Winbush v. Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1476 at n.4 (8th

through the Fourteenth Amendment. Golubski deprived Houcks of her liberty interest in not being subjected to slavery and involuntary servitude by forcing Houcks to perform sexual acts on Golubski under the threat of (and actual) physical harm.

291.    Simultaneously, Houcks, pursuant to the Fourth Amendment, has a fundamental liberty interest in being secure in her person against unreasonable searches and seizures. Golubski deprived Houcks of her liberty interest in being secure in her person against unreasonable searches and seizures by seizing her person for the express purpose of raping and/or sexually assaulting her and threating her and her family in order to ensure Golubski remained free of any criminal charges.

292.    Simultaneously, Houcks, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. Golubski deprived Houcks of her liberty interest in freedom of speech and access to the courts by preventing Houcks' access to these rights with physical harm to her and threats of physical harm to her and her family to ensure Golubski remained free of any criminal charges.

293.    Simultaneously, Houcks, pursuant to the Equal Protection Clause of the Fourteenth Amendment, has a fundamental liberty interest in being free from sexual harassment.[66] Golubski deprived Houcks of her liberty interest in being free from sexual harassment by propositioning her, sexually objectifying her, raping her, and otherwise sexually harassing her as described in more detail above.

294.    Golubski performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Houcks' clearly

---

Cir. 1995); *King v. Pridmore*, 961 F.3d 1135, 1142–43 (11th Cir. 2020), *cert. denied*, 209 L. Ed. 2d 546, 141 S. Ct. 2512 (2021).

[66] *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992), *cert. denied,* 509 U.S. 923 (1993) (*citing Starrett v. Wadley*, 876 F.2d 808, 824 (10th Cir. 1989)).

established constitutional rights. No reasonable officer in 1992 would believe this conduct was lawful.

295.    Golubski's acts, as described in the preceding paragraphs, were the direct and proximate cause of Houcks' injuries. Golubski knew that or was deliberately indifferent to his conduct resulted in injuries and damages to Houcks.

296.    Golubski's rape, sexual assault, physical and emotional assault, and threats to Houcks and her family was motivated by an evil motive or intent, or involved reckless or callous indifference to Houcks' federally protected rights.[67] Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[68] Given the nature of Golubski's conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future rape by police officers is highly advisable.[69] Consequently, Houcks is entitled to punitive damages.

## COUNT 2
### Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, KILL, BYE, ZEIGLER, AND WARE)

297.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

298.    Houcks is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

299.    By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Houcks to prevent her rape,

---

[67] *Smith v. Wade*, 461 U.S. 30, 56 (1983).
[68] *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).
[69] *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (quoting *Busche v. Burkee*, 649 F.2d 509, 520 (7th Cir. 1981)).

sexual assault, torture, unlawful seizure, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

300.    These Defendants' failures to intervene violated Houcks' clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the First, Fourth, Thirteenth, and Fourteenth Amendments. No reasonable Chief of Police or police officer at the times relevant to this Complaint would have believed that failing to intervene to prevent Golubski from raping, sexually assaulting, and threatening Houcks was lawful.

301.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Houcks' injuries. These Defendants knew or were deliberately indifferent to their conduct resulting in Houcks' rape and sexual assault and fear for her and her family's safety.

302.    These Defendants' failure to intervene in Golubski's conduct was motivated by an evil motive or intent, or involved reckless or callous indifference to Houcks' federally protected rights.[70] These Defendants' failure to intervene in Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[71] Given these Defendants' failure to intervene in light of the nature of Golubski's conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future failures to intervene in the rape by police officers is highly advisable.[72] Consequently, Houcks is entitled to punitive damages.

---

[70] *Smith*, 461 U.S. at 56.
[71] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[72] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

**COUNT 3**
**Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983**
(AGAINST DAILEY, KILL, BYE, GOLUBSKI, ZEIGLER, AND WARE)

303.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

304.    Houcks is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

305.    These Defendants and other unnamed employees of the Unified Government, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Houcks of her clearly established First, Fourth, Thirteenth, and Fourteenth Amendment rights to freedom of speech, access to the courts, freedom from unreasonable searches and seizures, freedom from slavery and involuntary servitude, and freedom from deprivation of liberty without due process of law.

306.    In furtherance of the conspiracy, these Defendants and other unnamed employees of the Unified Government engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of the actions of these Defendants and other unnamed employees of the Unified Government, Houcks was raped, sexually assaulted, physically and emotionally harmed, and suffered the other grievous damages and injuries as set forth above.

307.    The acts by these Defendants and other unnamed employees of the Unified Government, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Houcks' federally protected rights.[73] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's

---

[73] *Smith*, 461 U.S. at 56.

compensatory damages.[74] Given the nature of these Defendants' conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future rape by police officers is highly advisable.[75] Consequently, Houcks is entitled to punitive damages.

**COUNT 4**
**Supervisory Liability in Violation of 42 U.S.C. § 1983**
**(AGAINST DAILEY)**

308.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

309.    Houcks is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

310.    Golubski acted with impunity in an environment in which Chief of Police Dailey, Golubski's supervisor, (i) exercised control or direction; (ii) failed to supervise; (iii) knew of the violation and acquiesced in its continuance; and (iv) promulgated, created, implemented, or utilized a policy that caused the deprivation of Houcks' constitutional rights, all as explained in greater detail above.[76]

311.    Dailey's actions were with recklessness and/or deliberate indifference to Houcks' constitutional rights, as explained in greater detail above. Had Dailey exercised proper control, direction, or supervision; prevented Golubski's continued conduct once aware of his violations; and not promulgated, created, implemented, or utilized a policy that caused a deprivation of Houcks' constitutional rights, Golubski would not have raped, sexually assaulted, physically and emotionally harmed, and threatened Houcks. Dailey specifically supervised the specific acts taken

---

[74] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[75] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).
[76] *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

by Golubski, and Dailey knew of Golubski's conduct toward and treatment of Houcks (and other Black women) and either facilitated, approved, condoned, or turned a blind eye toward it.

312.    Dailey's reckless and/or deliberately indifferent conduct, all under color of state law, violated his duty, which had been clearly established by 1992, to supervise Golubski, and no reasonable Police Chief in 1992 would have believed that his conduct and actions in the face of actual or constructive notice of misconduct by his subordinate police officers was lawful.

313.    As a direct and proximate result of Dailey's actions (and failure to act), Houcks was raped, sexually assaulted, physically and emotionally harmed, and suffered the other grievous damages and injuries set forth above.

314.    Dailey's supervision of Golubski's conduct toward and treatment of Houcks (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Houcks' federally protected rights.[77] Dailey's supervision of Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[78] Given the nature of Dailey's supervision of Golubski's conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future chief of police supervision of police officer rape is highly advisable.[79] Consequently, Houcks is entitled to punitive damages.

## COUNT 5
### *Monell* Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

315.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

---

[77] *Smith*, 461 U.S. at 56.
[78] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[79] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

316.    Houcks is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

317.    The Unified Government was, at all times relevant to this Complaint, responsible for KCKPD.

318.    The Unified Government is the successor entity to KCK which employed all of the other Defendants at all times relevant to this Complaint.

319.    The Unified Government, by and through its final policymakers, had in force and effect in 1992 a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; and discouraging, preventing, and failing to investigate complaints of misconduct).

320.    The Unified Government, by and through its final policymakers, had in force and effect in 1992 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

321.    The Unified Government, by and through its final policymakers, had in force and effect in 1992 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

322.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges of its employees misconduct, as described in greater detail above.

323.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges

that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

324.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Houcks.

325.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and train its employees to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

326.    The egregious acts of the Unified Government's employees were deliberately ignored by the Unified Government, despite multiple employees and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

327.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Houcks' rape.

328.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Houck's rape, as well as all of the other grievous injuries and damages set forth above.

**Counts of Niko Quinn**

## COUNT 6

### Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983
### (AGAINST GOLUBSKI AND WARE)

329.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

330.     Quinn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

331.     These Defendants, acting individually and within the scope of their employment with the Unified Government, deprived Quinn of fundamental liberties without due process of law.

332.     Quinn, pursuant to the First Amendment, has a fundamental liberty interest, as a parent, in the care, custody, control, and association of her children.[80] This interest is implied to these Defendants through the Fourteenth Amendment. These Defendants deprived Quinn of her liberty interest in the care, custody, control, and association of her children by unlawfully threatening to remove her children from her home unless Quinn perjured herself in court.

333.     Simultaneously, Quinn, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. These Defendants deprived Quinn of her liberty interest in freedom of speech and access to the courts by forcing Quinn to perjure herself in order to ensure she was not unlawfully seized and detained and she continued to be able to exercise her First Amendment right to the care, custody, control, and association of her children; sexually assaulting her to prevent her from filing any complaints with KCKPD's Internal Affairs; and preventing Quinn's access to these rights with physical harm to her and threats of harm to her and her family to ensure these Defendants remained free of any criminal charges.

---

[80] *Troxel*, 530 U.S. at 65; Kan. Const. Art. XI, § 6; *Matter of Adoption of C.L.*, 308 Kan. at 1279.

334.    Simultaneously, Quinn, pursuant to the Fourth Amendment, has a fundamental liberty interest in being free from unreasonable searches and seizures. These Defendants deprived Quinn of her liberty interest in being secure in her person against unreasonable searches and seizures by repeatedly entering upon her home and person for the express purpose of sexually harassing her; intimidating, controlling, coercing, and threatening her and her family with false imprisonment unless Quinn perjured herself; propositioning her; sexually objectifying her; and otherwise sexually harassing her as described in more detail above.

335.    Quinn, pursuant to the Thirteenth Amendment, has a fundamental liberty interest in not being subjected to slavery and involuntary servitude.[81] This interest is implied to these Defendants through the Fourteenth Amendment. These Defendants deprived Quinn of her liberty interest in not being subjected to slavery and involuntary servitude by forcing Quinn to perjure herself in court under the threat of physical harm, false imprisonment, and of unlawfully having her children taken from her, and by forcing Quinn to perform sexual acts with threats of (and actual) physical harm.

336.    Simultaneously, Quinn, pursuant to the Equal Protection Clause of the Fourteenth Amendment, has a fundamental liberty interest in being free from sexual harassment.[82] Golubski deprived Quinn of her liberty interest in being free from sexual harassment by propositioning her, sexually objectifying her, and otherwise sexually harassing her, as described in more detail above.

337.    These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Quinn's clearly

---

[81] *Jobson*, 355 F.2d at 132; *Smith*, 36 F.4th at 675; *Winbush*, 66 F.3d at 1476, n.4; *King*, 961 F.3d at 1142–43.
[82] *Woodward*, 977 F.2d at 1400 (citing *Starrett*, 876 F.2d at 824).

established constitutional rights. No reasonable officer in 1994 would believe this conduct was lawful.[83]

338.    These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Quinn's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Quinn.

339.    These Defendants' acts, including Quinn's unlawful seizure, sexual assault, coerced perjury, physical and emotional assault, and threats to Quinn and her family were motivated by an evil motive or intent, or involved reckless or callous indifference to Quinn's federally protected rights.[84] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[85] Given the nature of these Defendants' conduct – including sexual assault and coerced perjury – the wisdom of pecuniary punishment is justified and deterring future rape by police officers is highly advisable.[86] Consequently, Quinn is entitled to punitive damages.

## COUNT 7
### Interference with Family Relationships in Violation of 42 U.S.C. § 1983
### (AGAINST GOLUBSKI, WARE, DAILEY, AND SWAFFORD)

340.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

341.    Quinn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

---

[83] *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (prosecutor's use of perjury to obtain convictions "is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation" which "may constitute state action within the purview of the Fourteenth Amendment").
[84] *Smith*, 461 U.S. at 56.
[85] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[86] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

342.     These Defendants, members of the Protection Racket, were compensated to cover up the gang murder of Doniel Quinn.

343.     These Defendants covered up the murder by conspiring to falsely convict Lamonte McIntyre (who they knew was innocent) and coercing Quinn to perjure herself.

344.     Golubski and Ware threatened Quinn that if she refused to commit perjury, Quinn's children would be taken away and Quinn would be falsely imprisoned.

345.     Quinn and her children enjoyed a close relationship and relied on each other for mutual support.

346.     These Defendants deliberately and specifically targeted Quinn's children to obtain leverage over Quinn so she would be forced to commit perjury, enabling Defendants to obtain a false conviction of an innocent man, and thereby further the Protection Racket's conspiracy to cover up a drug gang murder.

347.     Through their conduct, these Defendants intentionally deprived Quinn of her right of familial association with her children. As a result of these Defendants' unlawful and intentional actions, Quinn lived in constant fear that her children would be unlawfully taken from her if she failed at any time to acquiesce to Defendants' demands. As a result, Quinn was denied her full rights of familial association with her children.

348.     Dailey and Swafford were both aware of, endorsed, permitted, and encouraged Golubski's and Ware's threats to unlawfully take children away from their parents as leverage to coerce and suborn perjury, which Dailey and Swafford knew resulted in a wrongful conviction based on coerced and false testimony.

349.     These Defendants, through their misconduct and conspiracy to protect Doniel Quinn's murderer, deliberately violated Quinn's clearly established First Amendment and

Fourteenth Amendment rights to be free from unwarranted government interference with her familial relationships without due process of law.

350.     These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Quinn's clearly established constitutional rights. No reasonable Chief of Police or police officer in 1994 would believe this conduct was lawful.

351.     These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Quinn's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Quinn.

352.     These Defendants' acts, as described in the preceding paragraphs, were motivated by an evil motive or intent, or involved reckless or callous indifference to Quinn's federally protected rights.[87] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[88] Given the nature of these Defendants' conduct – including suborning perjury through unlawful threats to falsely imprison and steal a citizen's children – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officer and prosecuting attorneys is highly advisable.[89] Consequently, Quinn is entitled to punitive damages.

## COUNT 8
### Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, KILL, BYE, AND ZEIGLER)

353.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

---

[87] *Smith*, 461 U.S. at 56.
[88] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[89] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

354. Quinn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

355. By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Quinn to prevent Golubski and Ware from forcing her to commit perjury out of fear for the safety and security of her children and her family unit, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

356. These Defendants' failures to intervene violated Quinn's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the First, Fourth, Thirteenth, and Fourteenth Amendments. No reasonable Chief of Police or police officer at the times relevant to this Complaint would have believed that failing to intervene to prevent Golubski and Ware from suborning perjury from Quinn or threatening Quinn's security over her children, or Golubski's sexual assault of Quinn was lawful.

357. These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Quinn's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in Quinn committing perjury, fearing for her security over her children, and being sexually assaulted.

358. These Defendants' failure to intervene and prevent Golubski's sexual assault and Golubski's and Ware's suborning of perjury and threats to take away Quinn's children were motivated by an evil motive or intent, or involved reckless or callous indifference to Quinn's federally protected rights.[90] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[91] Given the nature of these

---

[90] *Smith,* 461 U.S. at 56.
[91] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).

Defendants' failure to intervene in Golubski's and Ware's conduct – including suborning perjury, threatening to take away Quinn's children if she did not perjure herself, and sexual assault – the wisdom of pecuniary punishment is justified and deterring future failure to intervene in such conduct by police officers and prosecuting attorneys is highly advisable.[92] Consequently, Quinn is entitled to punitive damages.

### COUNT 9
### Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, KILL, BYE, GOLUBSKI, ZEIGLER, AND WARE)

359.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

360.    Quinn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

361.    These Defendants and other unnamed employees of the Unified Government, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Quinn of her clearly established First, Fourth, Thirteenth, and Fourteenth Amendment rights.

362.    In furtherance of the conspiracy, these Defendants and other unnamed employees of the Unified Government engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of the actions of these Defendants and other unnamed employees of the Unified Government, Quinn was forced to perjure herself under threat that she would be physically harmed, falsely imprisoned, her children would be unlawfully taken away, Quinn was sexually assaulted, and she suffered the other grievous damages and injuries as set forth above.

---

[92] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

363.     The acts of these Defendants and other unnamed employees of the Unified Government, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Quinn's federally protected rights.[93] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[94] Given the nature of these Defendants' conduct – including suborning perjury, threatening to take away Quinn's children if she did not perjure herself, and sexual assault – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officer and prosecuting attorneys is highly advisable.[95] Consequently, Quinn is entitled to punitive damages.

## COUNT 10
## Supervisory Liability in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY AND SWAFFORD)

364.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

365.     Quinn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

366.     Golubski and Ware acted with impunity in an environment in which Chief of Police Dailey and Chief of Police Swafford, Golubski's and Ware's supervisors, (i) exercised control or direction; (ii) failed to supervise; (iii) knew of the violation and acquiesced in its continuance; and (iv) promulgated, created, implemented, or utilized a policy that caused the deprivation of Quinn's constitutional rights, all as explained in greater detail above.[96]

---

[93] *Smith*, 461 U.S. at 56.
[94] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[95] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).
[96] *Dodds*, 614 F.3d at 1195.

367.     These Defendants' actions were with recklessness and/or deliberate indifference to Quinn's constitutional rights, as explained in greater detail above. Had these Defendants exercised proper control, direction, or supervision; prevented Golubski's and Ware's continued conduct once aware of their violations; and not promulgated, created, implemented, or utilized a policy that caused deprivation of Quinn's constitutional rights, Golubski and Ware would not have threatened to unlawfully take away Quinn's children, coerced Quinn to perjure herself, or physically and emotionally harmed, threatened, and sexually assaulted Quinn. These Defendants specifically supervised the specific acts taken by Golubski and Ware, and these Defendants knew of Golubski's and Ware's conduct toward and treatment of Quinn (and other Black women) and either facilitated, approved, condoned, or turned a blind eye toward it.

368.     These Defendants' reckless and/or deliberately indifferent conduct, all under color of state law, violated their duty, which had been clearly established by 1994, to supervise Golubski and Ware, and no reasonable Police Chief in 1994 would have believed that their conduct and actions (or lack thereof) in the face of actual or constructive notice of misconduct by subordinate police officers was lawful.

369.     As a direct and proximate result of these Defendants' actions (and failure to act), Quinn was threatened, coerced to perjure herself, sexually assaulted, physically and emotionally harmed, and suffered the other grievous damages and injuries set forth above.

370.     These Defendants' supervision of Golubski's and Ware's conduct toward and treatment of Quinn (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Quinn's federally protected rights.[97] These Defendants' supervision of Golubski's and Ware's conduct demands deterrence and punishment beyond that

---

[97] *Smith*, 461 U.S. at 56.

offered by Section 1983's compensatory damages.[98] Given the nature of these Defendants' supervision of Golubski's and Ware's conduct – including coercing perjury, threats to take away her children, and sexual assault – the wisdom of pecuniary punishment is justified and deterring future chief of police supervision of police officers coercing perjury is highly advisable.[99] Consequently, Quinn is entitled to punitive damages.

## COUNT 11
### *Monell* Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

371. The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

372. Quinn is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

373. The Unified Government was, at all times relevant to this Complaint, responsible for KCKPD.

374. The Unified Government is the successor entity to KCK which employed all of the other Defendants at all times relevant to this Complaint.

375. The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; improper investigative practices to obtain wrongful convictions and support

---

[98] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[99] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

the government-sanctioned Protection Racket; and discouraging, preventing, and failing to investigate complaints of misconduct).

376.    The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

377.    The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

378.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that its employees used the misconduct, as described in greater detail above.

379.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

380.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Quinn.

381.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and train its employee detectives to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn

over exculpatory evidence to criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

382.    The egregious acts of Detective Defendants and other employees were deliberately ignored by the Unified Government, despite multiple employees and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

383.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, the sexual assault and threats against Quinn and her being forced to perjure herself so the Unified Government could wrongfully convict LaMonte McIntyre.

384.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind the sexual assault and threats against Quinn and her being forced to perjure herself, as well as all of the other grievous injuries and damages set forth above.

## **Counts of Saundra Newsom**

### **COUNT 12**
### **Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983**
### (AGAINST GOLUBSKI)

385.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

386.    Newsom is authorized to bring this civil claim against Golubski pursuant to the civil remedies provision of 42 U.S.C. § 1983.

387.    Golubski, acting individually and within the scope of his employment with the Unified Government, deprived Newsom of fundamental liberties without due process of law.

388.    Newsom, pursuant to the First Amendment, has a fundamental liberty interest, as a parent, in the care, custody, control, and association of her son Doniel Quinn.[100] This interest is implied to Golubski through the Fourteenth Amendment. Golubski deprived Newsom of her liberty interest in the care, custody, control, and association of her son by participating in the conspiracy to murder Doniel Quinn and agreeing to cover up the murder, enabling the real murderers to remain free and unprosecuted. Instead of actually investigating Doniel's murder, Golubski conspired to instead convict LaMonte McIntyre, who Golubski knew was innocent. Without Golubski's agreement to participate in the conspiracy by covering up the murder, Doniel would not have been murdered.

389.    Simultaneously, Newsom, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. Golubski deprived Newsom of her liberty interest in freedom of speech and access to the courts by preventing Newsom's access to these rights by sexually harassing Newsom while maintaining control over the investigation into Newsom's son's murder, openly threatening other Black women, including Quinn, brazenly falsely convicting McIntyre all while Golubski remained free of any criminal charges.

390.    Simultaneously, Newsom, pursuant to the Fourth Amendment, has a fundamental liberty interest in being free from unreasonable seizures. Golubski deprived Newsom of her liberty interest in being secure in her person against unreasonable searches and seizures by seizing her person on her front porch in order to proposition her, sexually objectify her, and otherwise sexually harass her as described in more detail above.

391.    Simultaneously, Newsom, pursuant to the Equal Protection Clause of the Fourteenth Amendment, has a fundamental liberty interest in being free from sexual harassment.[101]

---

[100] *Troxel*, 530 U.S. at 65; Kan. Const. Art. XI, § 6; *Matter of Adoption of C.L.*, 308 Kan. at 1279.
[101] *Woodward,* 977 F.2d at 1400 (*citing Starrett*, 876 F.2d at 824).

Golubski deprived Newsom of her liberty interest in being free from sexual harassment by propositioning her, sexually objectifying her, and otherwise sexually harassing her as described in more detail above.

392.    Golubski performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Newsom's clearly established constitutional rights. No reasonable officer in 1994 would believe this conduct was lawful.

393.    Golubski's acts, as described in the preceding paragraphs, were the direct and proximate cause of Newsom's injuries. Golubski knew, or was deliberately indifferent, that his conduct resulted in injuries and damages to Newsom.

394.    Golubski's sexual harassment of Newsom and conspiracy to cover up the real murderer of Newsom's son Doniel Quinn (and instead falsely convict an innocent LaMonte McIntyre, including suborning of perjury from witnesses) was motivated by an evil motive or intent, or involved reckless or callous indifference to Newsom's federally protected rights.[102] Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[103] Given the nature of Golubski's conduct – including sexual harassment and conspiring to cover up the real murderer of Newsom's son and suborning perjury – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officers is highly advisable.[104] Consequently, Newsom is entitled to punitive damages.

---

[102] *Smith*, 461 U.S. at 56.
[103] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[104] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

**COUNT 13**

**Interference with Family Relationships in Violation of 42 U.S.C. § 1983**
**(AGAINST GOLUBSKI, WARE, DAILEY, AND SWAFFORD)**

395.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

396.    Newsom is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

397.    These Defendants, members of the Protection Racket, were compensated to cover up the gang murder of Doniel Quinn.

398.    These Defendants covered up the murder by conspiring to falsely convict LaMonte McIntyre (who they knew was innocent) and coercing Quinn to perjure herself.

399.    Without these Defendants' willingness to cover up the crime and protect the murderer, Doniel Quinn would not have been murdered.

400.    Newsom and her son enjoyed a close relationship and relied on each other for mutual support.

401.    Through their conduct, these Defendants intentionally deprived Newsom of her right of familial association with her son. As a result of these Defendants' unlawful and intentional actions, Newsom's son was murdered which forever denied Newsom a relationship with him.

402.    Dailey and Swafford were both aware of, endorsed, permitted, and encouraged Golubski's and Ware's protection of the real murderer, which Dailey and Swafford knew resulted in a wrongful conviction based on coerced and false testimony.

403.    These Defendants, through their misconduct and conspiracy to protect Doniel Quinn's murderer, deliberately violated Newsom's clearly established First Amendment and

Fourteenth Amendment rights to be free from unwarranted government interference with her familial relationships without due process of law.

404.    These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Newsom's clearly established constitutional rights. No reasonable Chief of Police or police officer in 1994 would believe this conduct was lawful.

405.    These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Newsom's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Newsom.

406.    These Defendants' acts, as described in the preceding paragraphs, were motivated by an evil motive or intent, or involved reckless or callous indifference to Newsom's federally protected rights.[105] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[106] Given the nature of these Defendants' conduct – including conspiring to cover up the real murderer of Newsom's son Doniel and suborning perjury – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officer and prosecuting attorneys is highly advisable.[107] Consequently, Newsom is entitled to punitive damages.

## COUNT 14
### Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, KILL, BYE, AND ZEIGLER)

407.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

---

[105] *Smith*, 461 U.S. at 56.
[106] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[107] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

408.     Newsom is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

409.     By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Newsom to prevent her son from being murdered while her son's murderer was protected by Golubski and Ware, but with deliberate indifference, declined to do so.

410.     These Defendants' failures to intervene violated Newsom's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the First, Fourth, and Fourteenth Amendments. No reasonable Chief of Police or police officer at the times relevant to this Complaint would have believed that failing to intervene to prevent Golubski and Ware from conspiring with a drug gang to cover up the murder of a citizen, including suborning perjury to accomplish that task, and depriving Newsom of the consortium, aid, and comfort of her son, were lawful. No reasonable Chief of Police or police officer at the times relevant to this Complaint would have believed that failing to intervene to prevent Golubski from sexually harassing a citizen was lawful.

411.     These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Newsom's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in Newsom's son being murdered, his killer remaining free, an innocent man being falsely convicted, Newsom being deprived of the consortium, aid, and comfort of her son, and Golubski sexually harassing Newsom.

412.     These Defendants' failure to intervene while Golubski sexually harassed Newsom and Golubski and Ware permitted and protected the murderer of Newsom's son were motivated by an evil motive or intent, or involved reckless or callous indifference to Newsom's federally

protected rights.[108] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[109] Given the nature of these Defendants' failure to intervene and prevent Golubski's and Ware's conduct, including sexual harassment and false convictions, the wisdom of pecuniary punishment is justified and deterring future such failures to intervene and prevent such conduct by police officers and prosecuting attorneys is highly advisable.[110] Consequently, Newsom is entitled to punitive damages.

## COUNT 15
### Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983
### (Against Dailey, Swafford, Kill, Bye, Golubski, Zeigler, and Ware)

413.   The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

414.   Newsom is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

415.   These Defendants and other unnamed employees of the Unified Government, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Newsom of her clearly established First, Fourth, and Fourteenth Amendment rights.

416.   In furtherance of the conspiracy, these Defendants and other unnamed employees of the Unified Government engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of the acts of these Defendants and other unnamed employees of the Unified Government, Newsom's son was murdered, his murderer walked free,

---

[108] *Smith*, 461 U.S. at 56.
[109] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[110] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

Newsom was sexually assaulted, unreasonably seized, and she suffered the other grievous damages and injuries as set forth above.

417.    The acts of these Defendants and other unnamed employees of the Unified Government, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Newsom's federally protected rights.[111] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[112] Given the nature of these Defendants' conduct – including conspiring to cover up the real murderer of Newsom's son Doniel, suborning perjury, and sexual harassment – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officers and prosecuting attorneys is highly advisable.[113] Consequently, Newsom is entitled to punitive damages.

## COUNT 16
## Supervisory Liability in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY AND SWAFFORD)

418.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

419.    Newsom is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

420.    Golubski and Ware acted with impunity in an environment in which Chief of Police Dailey and Chief of Police Swafford, Golubski's and Ware's supervisors, (i) exercised control or direction; (ii) failed to supervise; (iii) knew of the violation and acquiesced in its continuance; and

---

[111] *Smith*, 461 U.S. at 56.
[112] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[113] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

(iv) promulgated, created, implemented, or utilized a policy that caused the deprivation of Newsom's constitutional rights, all as explained in greater detail above.[114]

421.    These Defendants' actions were with recklessness and/or deliberate indifference to Newsom's constitutional rights, as explained in greater detail above. Had these Defendants exercised proper control, direction, or supervision; prevented Golubski's and Ware's continued conduct once aware of their violations; and not promulgated, created, implemented, or utilized a policy that caused deprivation of Newsom's constitutional rights, Golubski and Ware would not have protected the murderer of Newsom's son Doniel Quinn, and Mr. Quinn would consequently not have been murdered, and Newsom would not have been sexually assaulted, detained and emotionally harmed. These Defendants specifically supervised the specific acts taken by Golubski and Ware, and these Defendants knew of Golubski's and Ware's conduct toward and treatment of Newsom (and other Black women) and either facilitated, approved, condoned, or turned a blind eye toward it.

422.    These Defendants' reckless and/or deliberately indifferent conduct, all under color of state law, violated their duty, which had been clearly established by 1994, to supervise Golubski and Ware, and no reasonable Police Chief in 1994 would have believed that his conduct and actions in the face of actual or constructive notice of misconduct by his subordinate police officers was lawful.

423.    As a direct and proximate result of these Defendants' actions (and failure to act), Newsom's son was murdered, Newsom was unlawfully detained, sexually assaulted, emotionally harmed, and she suffered the other grievous damages and injuries set forth above.

---

[114] *Dodds*, 614 F.3d at 1195.

424.    These Defendants' supervision of Golubski's conduct toward and treatment of Newsom (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Newsom's federally protected rights.[115] These Defendants' supervision of Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[116] Given the nature of these Defendants' supervision of Golubski's conduct – including covering up a murder and sexually assaulting Newsom – the wisdom of pecuniary punishment is justified and deterring future chief of police supervision of police officers coercing perjury is highly advisable.[117] Consequently, Newsom is entitled to punitive damages.

## COUNT 17
### *Monell* Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

425.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

426.    Newsom is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

427.    The Unified Government was, at all times relevant to this Complaint, responsible for KCKPD.

428.    The Unified Government is the successor entity to KCK which employed all of the other Defendants at all times relevant to this Complaint.

429.    The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of unconstitutional misconduct, including, in particular,

---

[115] *Smith*, 461 U.S. at 56.
[116] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[117] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket; and discouraging, preventing, and failing to investigate complaints of misconduct).

430.    The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

431.    The Unified Government, by and through its final policymakers, had in force and effect in 1994 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

432.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that its employees used the misconduct, as described in greater detail above.

433.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

434.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Newsom.

435.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and

train its employees to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

436.    The egregious acts of the Unified Government's employees were deliberately ignored by the Unified Government, despite multiple employees, and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

437.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Newsom's unlawful detention, sexual assault, the murder of Newsom's son (because the killer was protected by the Protection Racket), and the failure to convict the real killer and instead falsely convict LaMonte McIntyre by eliciting perjurious testimony.

438.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Newsom's sexual assault, the murder of her son, the failure to convict her son's killer, as well as all of the other grievous injuries and damages set forth above.

### Counts of Ophelia Williams

### COUNT 18
### Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983
### (AGAINST GOLUBSKI AND ZEIGLER)

439.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

440.    Williams is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

441.     These Defendants, acting individually and within the scope of their employment with the Unified Government, deprived Williams of fundamental liberties without due process of law.

442.     Williams, pursuant to the First Amendment, has a fundamental liberty interest, as a parent, in the care, custody, control, and association of her children.[118] This interest is implied to these Defendants through the Fourteenth Amendment. These Defendants deprived Williams of her liberty interest in the care, custody, control, and association of her children by unlawfully detaining her children; unlawfully removing her children from her home; falsely convicting her children of a crime they did not commit; and making sexual advances on her minor daughter.

443.     Simultaneously, Williams, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. These Defendants deprived Williams of her liberty interest in freedom of speech and access to the courts by preventing Williams' access to these rights with physical harm to her and threats of physical harm to her and her family to ensure these Defendants remained free of any criminal charges.

444.     Simultaneously, Williams, pursuant to the Fourth Amendment, has a fundamental liberty interest in being free from unreasonable searches and seizures. These Defendants deprived Williams of her liberty interest in being secure in her person against unreasonable searches and seizures by repeatedly entering her home for the express purpose of raping and/or sexually assaulting her; forcing her to perform sexual acts on Golubski under the threat, proximity, and knowledge of Zeigler; unlawfully entering her home and detaining her and her children without probable cause; unlawfully entering her home and removing her children from her home without

---

[118] *Troxel*, 530 U.S. at 65; Kan. Const. Art. XI, § 6; *Matter of Adoption of C.L.*, 308 Kan. at 1279.

probable cause; and unlawfully entering her home and making sexual advances on her and her minor daughter.

445.    Simultaneously, Williams, pursuant to the Thirteenth Amendment, has a fundamental liberty interest in not being subjected to slavery and involuntary servitude.[119] This interest is implied to these Defendants through the Fourteenth Amendment. These Defendants deprived Williams of her liberty interest in not being subjected to slavery and involuntary servitude by repeatedly forcing Williams to perform sexual acts on Golubski under the threat, proximity, and knowledge of Zeigler – the detective investigating her teenage sons – and threats of (and actual) physical harm to both herself and her sons.

446.    Simultaneously, Williams, pursuant to the Equal Protection Clause of the Fourteenth Amendment, has a fundamental liberty interest in being free from sexual harassment.[120] Golubski deprived Williams of her liberty interest in being free from sexual harassment by propositioning her, sexually objectifying her, and otherwise sexually harassing her and her minor daughter as described in more detail above.

447.    These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Williams' clearly established constitutional rights. No reasonable officer in 1999 would believe this conduct was lawful.

448.    These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Williams' injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Williams.

---

[119] *Jobson*, 355 F.2d at 132; *Smith*, 36 F.4th at 675; *Winbush*, 66 F.3d at 1476, n.4; *King*, 961 F.3d at 1142–43.
[120] *Woodward*, 977 F.2d at 1400 (citing *Starrett*, 876 F.2d at 824).

449.    These Defendants' acts, including Williams' unlawful seizure, rape, sexual assault, physical and emotional assault, and threats to Williams and her family were motivated by an evil motive or intent, or involved reckless or callous indifference to Williams' federally protected rights.[121] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[122] Given the nature of these Defendants' conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future rape by police officers is highly advisable.[123] Consequently, Williams is entitled to punitive damages.

## COUNT 19
### Interference with Family Relationships in Violation of 42 U.S.C. § 1983
### (AGAINST GOLUBSKI, ZEIGLER, DAILEY, AND SWAFFORD)

450.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

451.    Williams is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

452.    Golubski lied to Williams when her children – two fourteen-year-olds and one thirteen-year-old – were whisked away and taken downtown for intense interrogation without a parent or lawyer present.

453.    These Defendants, members of the Protection Racket, were compensated to cover up the gang murder of Wilbur and Wilma Williams.

454.    These Defendants covered up the murder by conspiring to falsely convict Ronell and Donell Williams (who they knew were innocent) by eliciting false convictions out of them.

---

[121] *Smith*, 461 U.S. at 56.
[122] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[123] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

455.   Williams and her sons enjoyed a close relationship and relied on each other for mutual support.

456.   Without these Defendants' actions, Ronell and Donell Williams would not have been falsely convicted in the gang murder of Wilbur and Wilma Williams.

457.   Golubski deliberately targeted Williams' sons specifically to obtain leverage over Williams so she would be forced to endure his rapes and sexual assaults.

458.   Through their conduct, these Defendants intentionally deprived Williams of her right of familial association with her sons. As a result of these Defendants' unlawful and intentional actions, Ronell and Donell Williams were coerced to falsely confess to a murder they did not commit and were subsequently falsely convicted and imprisoned. These Defendants wrongfully detained and arrested Williams' sons, causing their wrongful incarceration by fabricating evidence, exacting false identifications, and suppressing exculpatory evidence (and at the same time knowing or having reason to know that Williams' sons had nothing to do with the crime), these Defendants denied Williams a relationship with each of her sons while they've spent decades in prison.

459.   Dailey and Swafford were both aware of, endorsed, permitted, and encouraged Golubski and Zeigler's protection of the real murderer(s), which Dailey and Swafford knew resulted in the wrongful conviction of Ronell and Donell based on coerced and false testimony.

460.   These Defendants, through their misconduct and conspiracy to protect Wilbur and Wilma Williams' murderer(s), deliberately violated Williams' clearly established First Amendment and Fourteenth Amendment rights to be free from unwarranted government interference with her familial relationships without due process of law.

461.   These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Williams' clearly

established constitutional rights. No reasonable Chief of Police or police officer in 1999 would believe this conduct was lawful.

462.    These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Williams' injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Williams.

463.    These Defendants' acts, as described in the preceding paragraphs, were motivated by an evil motive or intent, or involved reckless or callous indifference to Williams' federally protected rights.[124] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[125] Given the nature of these Defendants' conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future such conduct by police officers and prosecuting attorneys is highly advisable.[126] Consequently, Williams is entitled to punitive damages.

## COUNT 20
## Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, KILL, BYE, AND WARE)

464.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

465.    Williams is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

466.    By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Williams to prevent her

---

[124] *Smith*, 461 U.S. at 56.
[125] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[126] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

rape, sexual assault, unlawful seizure, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

467.    These Defendants' failures to intervene violated Williams' clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the First, Fourth, Thirteenth, and Fourteenth Amendments. No reasonable Chief of Police or police officer in 1999 would have believed that failing to intervene to prevent Golubski from raping and sexually assaulting, and Golubski and Zeigler from threatening Williams or depriving her of the consortium, aid, and comfort of her sons were lawful.

468.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Williams' injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in Williams' continued rape and sexual assault, and in depriving her of the consortium, aid, and comfort of her sons.

469.    These Defendants' failure to intervene and prevent Golubski's rape, sexual assault, and physical and emotional assault, and threats to Williams and her family was motivated by an evil motive or intent, or involved reckless or callous indifference to Williams' federally protected rights.[127] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[128] Given the nature of these Defendants' failure to intervene and prevent Golubski's and Zeigler's conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future failures to intervene and prevent rape by police officers is highly advisable.[129] Consequently, Williams is entitled to punitive damages.

---

[127] *Smith*, 461 U.S. at 56.
[128] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[129] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

## COUNT 21
## Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, KILL, BYE, GOLUBSKI, ZEIGLER, AND WARE)

470.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

471.    Williams is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

472.    These Defendants and other unnamed employees of the Unified Government, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Williams of her clearly established First, Fourth, Thirteenth, and Fourteenth Amendment rights.

473.    In furtherance of the conspiracy, these Defendants and other unnamed employees of the Unified Government engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of the acts of these Defendants and other unnamed employees of the Unified Government, Williams was unlawfully seized, repeatedly raped, sexually assaulted, physically and emotionally assaulted, and suffered the other grievous damages and injuries set forth above.

474.    The acts of these Defendants and other unnamed employees of the Unified Government, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Williams' federally protected rights.[130] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[131] Given the nature of these Defendants' conduct – including rape – the

---

[130] *Smith*, 461 U.S. at 56.
[131] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).

wisdom of pecuniary punishment is justified and deterring future rape by police officers is highly advisable.[132] Consequently, Williams is entitled to punitive damages.

## COUNT 22
### Supervisory Liability in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY AND SWAFFORD)

475.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

476.    Williams is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

477.    Golubski and Zeigler acted with impunity in an environment in which Chief of Police Dailey and Chief of Police Swafford, Golubski's and Zeigler's supervisors, (i) exercised control or direction; (ii) failed to supervise; (iv) knew of the violation and acquiesced in its continuance; and (v) promulgated, created, implemented, or utilized a policy that caused the deprivation of Williams' constitutional rights, all as explained in greater detail above.[133]

478.    These Defendants' actions were with recklessness and/or deliberate indifference to Williams' constitutional rights, as explained is greater detail above. Had these Defendants exercised proper control, direction, or supervision; prevented Golubski's and Zeigler's continued conduct once aware of their violations; and not promulgated, created, implemented; or utilized a policy that caused deprivation of Williams' constitutional rights, Golubski and Zeigler would not have targeted Williams' children or raped, sexually assaulted, physically and emotionally harmed, and threatened Williams. These Defendants specifically supervised the specific acts taken by Golubski and Zeigler, and these Defendants knew of Golubski's and Zeigler's conduct toward and

---

[132] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).
[133] *Dodds*, 614 F.3d at 1195.

treatment of Williams (and other Black women) and either facilitated, approved, condoned, or turned a blind eye toward it.

479.    These Defendants' reckless and/or deliberately indifferent conduct, all under color of state law, violated their duty, which had been clearly established by 1992 (and certainly in 1999), to supervise Golubski and Zeigler, and no reasonable Police Chief in 1992 (and certainly in 1999) would have believed that their conduct and actions in the face of actual or constructive notice of misconduct by subordinate police was lawful.

480.    As a direct and proximate result of these Defendants' actions (and failure to act), Williams was seized, raped, sexually assaulted, physically and emotionally harmed, and suffered the other grievous damages and injuries set forth above.

481.    These Defendants' supervision of Golubski's and Zeigler's conduct toward and treatment of Williams (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Williams' federally protected rights.[134] These Defendants' supervision of Golubski's and Zeigler's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[135] Given the nature of these Defendants' supervision of Golubski's and Zeigler's conduct – including rape – the wisdom of pecuniary punishment is justified and deterring future chief of police supervision of police officer rape is highly advisable.[136] Consequently, Williams is entitled to punitive damages.

---

[134] *Smith*, 461 U.S. at 56.
[135] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[136] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

## COUNT 23
### *Monell* Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

482.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

483.    Williams is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

484.    The Unified Government was, at all times relevant to this Complaint, responsible for KCKPD.

485.    The Unified Government is the successor entity to KCK which employed all of the other Defendants at all times relevant to this Complaint.

486.    The Unified Government, by and through its final policymakers, had in force and effect in 1999 a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket; and discouraging, preventing, and failing to investigate complaints of misconduct).

487.    The Unified Government, by and through its final policymakers, had in force and effect in 1999 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

488.    The Unified Government, by and through its final policymakers, had in force and effect in 1999 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

122

489.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges of its employees' misconduct, as described in greater detail above.

490.    The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

491.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Williams.

492.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and train its employees to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

493.    The egregious acts of the Unified Government's employees were deliberately ignored by the Unified Government, despite multiple employees, and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

494.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Williams' rape and the false convictions of her sons.

495.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Williams' rape, the false conviction of her sons, as well as all of the other grievous injuries and damages set forth above.

### Counts of Richelle Miller

### COUNT 24
### Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983
### (AGAINST KILL AND BYE)

496.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

497.    Miller is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

498.    These Defendants, acting individually and within the scope of their employment with the Unified Government, deprived Miller of fundamental liberties without due process of law.

499.    Miller, pursuant to the Fourth Amendment, has a fundamental liberty interest in being secure in her person against unreasonable searches and seizures. These Defendants deprived Miller of her liberty interest in being secure in her person against unreasonable searches and seizures by torturing her and forcing her to view her father's burnt corpse under the guise of identifying the body when these Defendants knew that Miller – and indeed no person – could identify her father's remains visually; by unlawfully seizing and detaining her without probable cause for 19 hours; by unlawfully seizing and detaining her in conditions designed to torture and degrade her; by inquiring into matters designed to further abuse and traumatize her; by making inappropriate sexual advances and sexually assaulting her – including telling her that the unlawful seizure would end if she would allow police officers to rape her – while under intense, unlawful, and inappropriate police interrogation.

500.     Simultaneously, Miller, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. These Defendants deprived Miller of her liberty interest in freedom of speech and access to the courts by preventing Miller's access to these rights with false allegations and unlawful conduct designed to intimidate and prevent Miller's exercising of these rights.

501.     Simultaneously, Miller, pursuant to the Equal Protection Clause of the Fourteenth Amendment, has a fundamental liberty interest in being free from sexual harassment.[137] These Defendants deprived Miller of her liberty interest in being free from sexual harassment by propositioning her, sexually objectifying her, and otherwise sexually harassing her as described in more detail above.

502.     These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Miller's clearly established constitutional rights. No reasonable officer in 2002 would believe this conduct was lawful.

503.     These Defendants' acts, as described in the preceding paragraphs, were the direct and proximate cause of Miller's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Miller.

504.     These Defendants' acts, including Miller's unlawful seizure, requirement that she view her father's burnt corpse, sexual assault, and physical and emotional assault, were motivated by an evil motive or intent, or involved reckless or callous indifference to Miller's federally protected rights.[138] These Defendants' conduct demands deterrence and punishment beyond that

---

[137] *Woodward,* 977 F.2d at 1400 (citing *Starrett,* 876 F.2d at 824).
[138] *Smith*, 461 U.S. at 56.

offered by Section 1983's compensatory damages.[139] Given the nature of these Defendants' conduct – including unlawfully seizing, sexually assaulting, and torturing Miller – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[140] Consequently, Miller is entitled to punitive damages.

## COUNT 25
### Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST MILLER, ZEIGLER, GOLUBSKI, AND WARE)

505.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

506.    Miller is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

507.    By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Miller to prevent her sexual assault, torture, unlawful seizure, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

508.    These Defendants' failures to intervene violated Miller's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the First, Fourth, and Fourteenth Amendments. No reasonable Chief of Police or police officer from at least 1993 to 2002 would have believed that failing to intervene to prevent Kill and Bye from sexually assaulting, torturing, and unlawfully seizing Miller was lawful.

509.    These Defendants' acts and omissions (including the failures of Police Chief Defendants to stop the known unconstitutional conduct throughout KCKPD), as described in the

---

[139] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[140] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

preceding paragraphs, were the direct and proximate cause of Miller's injuries. These Defendants knew, or were deliberately indifferent, that their conduct would result in Miller's unlawful seizure, requirement that she view her father's burnt corpse, sexual assault, and physical and emotional assault.

510. These Defendants' failure to intervene to prevent Kill's and Bye's acts, including Miller's unlawful seizure, torture, requirement that she view her father's burnt corpse, sexual assault, and physical and emotional assault, were motivated by an evil motive or intent, or involved reckless or callous indifference to Miller's federally protected rights.[141] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[142] Given the nature of these Defendants' conduct – including unlawfully seizing, sexually assaulting, and torturing Miller – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[143] Consequently, Miller is entitled to punitive damages.

## COUNT 26
### Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983
### (AGAINST MILLER, ZEIGLER, KILL, BYE, GOLUBSKI, AND WARE)

511. The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

512. Miller is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

513. These Defendants and other unnamed employees of the Unified Government, acting within the scope of their employment and under color of state law, agreed among themselves

---

[141] *Smith*, 461 U.S. at 56.
[142] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[143] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

and with others to act in concert in order to deprive Miller of her clearly established First, Fourth, and Fourteenth Amendment rights.

514.   In furtherance of the conspiracy, these Defendants and other unnamed employees of the Unified Government engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of the acts of these Defendants and other unnamed employees of the Unified Government, Miller was unlawfully seized, tortured, required to view her father's burnt corpse, sexually assaulted, and physically and emotionally assaulted and she suffered the other grievous damages and injuries set forth above.

515.   The acts of these Defendants and other unnamed employees of the Unified Government, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Miller's federally protected rights.[144] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[145] Given the nature of these Defendants' conduct – including unlawfully seizing, sexually assaulting, and torturing Miller – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[146] Consequently, Miller is entitled to punitive damages.

### COUNT 27
### Supervisory Liability in Violation of 42 U.S.C. § 1983
### (AGAINST MILLER, ZEIGLER, AND GOLUBSKI)

516.   The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

---

[144] *Smith*, 461 U.S. at 56.
[145] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[146] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

517.     Miller is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

518.     Kill and Bye acted with impunity in an environment in which these Defendants, supervisors of Kill and Bye, (i) personally participated; (ii) exercised control or direction; (iii) failed to supervise; (iv) knew of the violation and acquiesced in its continuance; and (v) promulgated, created, implemented, or utilized a policy that caused the deprivation of Miller's constitutional rights, all as explained in greater detail above.[147]

519.     These Defendants' actions were with recklessness and/or deliberate indifference to Miller's constitutional rights, as explained in greater detail above. Had these Defendants exercised proper control, direction, or supervision; prevented Kill's and Bye's continued conduct once aware of their violations; and not promulgated, created, implemented, or utilized a policy that caused deprivation of Miller's constitutional rights, Kill and Bye would not have sexually assaulted, tortured, and physically and emotionally harmed Miller. These Defendants specifically supervised the specific acts taken by Kill and Bye, and these Defendants knew of Kill and Bye's conduct toward and treatment of Miller (and other Black women) and either participated, facilitated, approved, condoned, or turned a blind eye toward it.

520.     These Defendants' reckless and/or deliberately indifferent conduct, all under color of state law, violated their duty, which had been clearly established by 2002, to supervise Kill and Bye, and no reasonable police supervisor in 2002 would have believed that this conduct and actions in the face of actual or constructive notice of misconduct by subordinate police was lawful.

---

[147] *Dodds*, 614 F.3d at 1195.

521.     As a direct and proximate result of these Defendants' actions (and failure to act), Miller was unlawfully seized, tortured, sexually assaulted, and physically and emotionally harmed, and she suffered the other grievous damages and injuries set forth above.

522.     These Defendants' supervision of Kill's and Bye's conduct toward and treatment of Miller (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Miller's federally protected rights.[148] These Defendants' supervision of Kill's and Bye's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[149] Given the nature of these Defendants' supervision of Kill's and Bye's conduct – including unlawfully seizing, sexually assaulting, and torturing Miller – the wisdom of pecuniary punishment is justified and deterring future chief of police and supervising detective supervision of police officers sexually assaulting and torturing is highly advisable.[150] Consequently, Miller is entitled to punitive damages.

## COUNT 28
### *Monell* Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

523.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

524.     Miller is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

525.     The Unified Government was, at all times relevant to this Complaint, responsible for KCKPD.

---

[148] *Smith*, 461 U.S. at 56.
[149] *Jolivet*, 966 F.2d at 577 (quoting *Smith*, 461 U.S. at 54).
[150] *Miller*, 705 F.2d at 377 (quoting *Busche*, 649 F.2d at 520).

526.     The Unified Government is the successor entity to KCK which employed all of the other Defendants at all times relevant to this Complaint.

527.     The Unified Government, by and through its final policymakers, had in force and effect in 2002 a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket; and discouraging, preventing, and failing to investigate complaints of misconduct).

528.     The Unified Government, by and through its final policymakers, had in force and effect in 2002 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

529.     The Unified Government, by and through its final policymakers, had in force and effect in 2002 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

530.     The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges of its employees' misconduct, as described in greater detail above.

531.     The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

532.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Miller.

533.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and train its employee to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

534.    The egregious acts of the Unified Government's employees were deliberately ignored by the Unified Government, despite multiple employees, and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

535.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Miller's torture, sexual assault, and unlawful detention.

536.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Miller's torture, sexual assault, unlawful detention, as well as all of the other grievous injuries and damages set forth above.

### DEMAND FOR JURY TRIAL

537.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial to a jury on all issues so triable in this action.

## DESIGNATION OF PLACE OF TRIAL

538.     Pursuant to D. Kan. Rule 40.2, Plaintiffs request Kansas City, Kansas as the place of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court award compensatory damages to Plaintiffs and against all Defendants, jointly and severally, as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

B.     That the Court award punitive damages to Plaintiffs, jointly and severally, in an amount to be determined at trial, for Defendants' violations of federal law that will deter such conduct by Defendants in the future;

C.     For a trial by jury;

D.     For pre-judgment and post-judgment interest and recovery of Plaintiffs' costs and expenses of litigation, including reasonable attorneys' fees;

E.     Award Plaintiffs injunctive relief that requires the Unified Government to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the sexual abuse, exploitation, and trafficking of the Citizens of Wyandotte County; and

F.     For any and all other relief to which Plaintiffs may be entitled.

Respectfully submitted,

/s/ William J Skepnek
William J. Skepnek    KS Bar #10149
THE SKEPNEK LAW FIRM, PA
1 Westwood Rd.
Lawrence, KS 66044
Telephone:     (785) 856-3100
Facsimile:     (785) 856-3099
bskepnek@skepneklaw.com

AND

/s/ Quentin M. Templeton
Frankie J. Forbes       KS Bar #20725
Quentin M. Templeton  KS Bar #26666
Anne C. Emert           KS Bar #22144
FORBES LAW GROUP, LLC
12900 Metcalf Avenue, Suite 210
Overland Park, Kansas 66213
Telephone:     (913) 341-8600
Facsimile:     (913) 341-8606
fforbes@forbeslawgroup.com
qtempleton@forbeslawgroup.com
aemert@forbeslawgroup.com

AND

/s/ Brennan P. Fagan
Brennan P. Fagan       KS Bar #20430
FAGAN & EMERT, LLC
800 New Hampshire Street, Suite 110
Lawrence, Kansas 66044
Telephone:     (785) 331-0300
Facsimile:     (785) 331-0303
bfagan@faganemert.com

ATTORNEYS FOR PLAINTIFFS